STATE OF NORTH CAROLINA v. LEROY THOMAS AND WILLIE WILKINS

No. 104

(Filed 10 May 1977)

1. **Criminal Law § 66.10— in-court identification — pretrial confrontation at sheriff's office — no taint**

     The in-court identification of each of the defendants by each of two armed robbery victims had its origin in their observations of the defendants at the scene of the robbery immediately before and during

State v. Thomas

its perpetration and was not tainted by the unintentional, unplanned confrontation of the defendants by one of the victims in the office of the sheriff, or by the viewing by either victim of photographs at the sheriff's office.

2. **Robbery § 4— armed robbery — sufficiency of evidence**

Evidence was sufficient for the jury in a prosecution for armed robbery where it tended to show that the robbery was committed; five minutes earlier defendants were in a black Volkswagen immediately outside the office where the robbery occurred; the robbers wore shirts similar in appearance to those then worn by defendants; one of the robbers wore conspicuous gloves, similar in appearance to gloves worn by one of the defendants five minutes before the robbery; defendant Thomas was identified by two of the victims as one of the robbers; the robbers left the crime scene in the same Volkswagen earlier observed by two of the victims, the keys of which one of the defendants had in his pocket one hour after the robbery; and the robbers left at the crime scene a pistol owned by one defendant's brother with whom he lived.

3. **Criminal Law § 168.5— jury instructions — evidence misstated — failure to object**

Trial judge's misstatement of the State's evidence with respect to the robbers' shirts was of no substantial consequence; moreover, defendants' failure to call this error to the attention of the court before the jury retired to consider its verdict rendered their assignment of error of no avail.

4. **Criminal Law § 122.2— failure to reach verdict — additional instructions — no coercion**

Where the jury returned to the courtroom after four hours of deliberation and reported that it had not reached a verdict as to one of the defendants, that defendant was not prejudiced by the trial court's instruction to the jury to "try again" but not "to reach a verdict that your consciences forbid you to reach," since the instruction did not coerce the jury but left them free to disagree and thus return no verdict.

5. **Criminal Law § 101.4— reading of direct examination testimony by reporter — failure to read cross-examination testimony — no error**

Defendant was not prejudiced where the jury, after having begun its deliberations, returned to the courtroom and requested the court to have the court reporter read a specified portion of the testimony on direct examination of a named witness, and the court allowed such request, but denied defendant's request that the witness's testimony on cross-examination be read to the jury, since there was no testimony of the witness on cross-examination which was in conflict with or in contradiction of the testimony on direct examination so read back to the jury in response to its request.

APPEAL by defendants from *Tillery, J.,* at the 25 October 1976 Criminal Session of WAYNE.

State v. Thomas

By separate indictments, four against each defendant, all proper in form, each defendant was charged with armed robbery on 2 April 1976 of four individuals, James P. Moore, Patricia Henry, Shafford Britt and Ralph Mills, in the office of the Moore Lumber Company near Goldsboro. Without objection, the cases were consolidated for trial. The jury found each defendant guilty of each of the alleged robberies. Each defendant was sentenced to prison for life in each of the four cases, the sentences to run concurrently.

Neither defendant offered any evidence. The evidence for the State was to the following effect:

Shortly after noon on 2 April 1976, the four robbery victims were in the small office of the lumber company. Suddenly, two or more Negro men, armed with pistols, each wearing a ladies' stocking over his head and face, one stocking being knotted, burst into the office, forced the four victims to lie upon the floor, kicked and stomped them and struck Mr. Moore in the face with a pistol, as the result of which the pistol fired, no one being struck by the bullet. The intruders took money from each of the four victims and from the office cash box, left the office and drove away in a black Volkswagen on which there was no license plate, the entire episode being completed in from one to three minutes. While one of the intruders was stomping Mr. Britt, another said Mr. Britt had had a heart attack so they had better "take it easy on him." One of the robbers left his pistol, a Charter Arms .44 caliber revolver, containing five live bullets and one exploded shell, in the office.

Mr. Britt, an employee of the lumber company, had sustained a heart attack some months earlier and, because of this, his fellow employees had watched over him. At that time the defendant Thomas had been an employee of the lumber company, working with Mr. Britt. The robbery occurred on the mill's regular pay day.

Some twenty minutes prior to the robbery, Mr. Moore, while in the lumber yard outside the office, observed a black Volkswagen driving about near the intersection of the public road and the path leading to the lumber yard office. He later observed this vehicle drive along the path, past the mill into a field, and then back up rapidly toward the office, almost striking a parked car. He walked over to the Volkswagen and, observing three or four Negro men in it, asked them what they

wanted. He saw that the car did not have a license plate on it but did have a red, green and black tag just below the place where the license plate is customarily carried. Its left front fender was dented. Its motor "was very peppy and revved up fast and had a good sound to. it."

At this time, Mr. Moore was about two feet from the driver, who looked him straight in the face, and whom Mr. Moore identified, in court, as the defendant Wilkins. They talked for about two minutes, the occupants of the car asking directions to Slocumb Street. Mr. Moore then concluded that the occupants of the car were "up to no good" because the car carried no license plate and also because he observed the defendant Thomas, his former employee, whose name he did not then recall, in the vehicle and knew that Thomas knew the way to Slocumb Street. While so standing beside the Volkswagen, Mr. Moore looked at Thomas, sitting in the back seat, for two or three minutes and got a good mental picture of him. In court, Mr. Moore identified Thomas as the man he observed in the back seat of the Volkswagen. Both the driver and the man in the back seat wore "sporty" type shirts of "silky" texture.

The Volkswagen drove away and Mr. Moore went into the office. Some five minutes thereafter, Mr. Moore heard the same car drive up to the office, identifying it by the sound of the motor. He told Mrs. Henry, his secretary, to look out the window and see if it was the same Volkswagen. Before she could do so, the robbers burst into the office. They wore the same type of shirts he had just observed upon the driver of the Volkswagen and the occupant of its rear seat.

When the robbers left the office, Mr. Moore heard the motor of their car "rev up," the sound being exactly the same as that which he had heard some five minutes earlier, when the Volkswagen had departed after his conversation with the driver. Mr. Moore immediately ran out of the office and looked at the departing car, then about 20 yards away. He recognized it as the same Volkswagen. It had the same red, green and black tag on its rear and no license plate.

Mr. Britt testified that he knew Leroy Thomas, who had worked some three months under his supervision at the mill. At the time of Mr. Moore's conversation with the occupants of the Volkswagen, just a few minutes prior to the robbery, Mr. Britt was in the office and saw the Volkswagen, a picture of which

he identified in court. He then observed, from a distance of 15 or 20 feet, the driver's face so that he got a mental picture of him. He also observed that the driver was wearing white gloves with black polka dots. One of the robbers wore such gloves. In court, he identified the defendant Wilkins as the driver of the Volkswagen at that time. After the robbery, Mr. Britt observed the robbers' car going down the path to the public road. It appeared to be the same vehicle.

Mr. Britt further identified Thomas, in court, as one of the robbers, testifying that he recognized him "through the stocking" as someone he had known before but whose name he did not recall. For this reason, he did not tell the police officers, who responded to the call, Thomas' name but did tell one of them that the robber so observed by him had worked at the mill.

The pistol left in the office by one of the robbers had been purchased new from a dealer six days prior to the robbery by a brother of the defendant Wilkins, with whom the defendant Wilkins lived on Slocumb Street at the time of the robbery.

After receiving from the victims general descriptions of the Volkswagen and of the robbers, the investigating officers, within about an hour, found a black Volkswagen in a parking lot on Slocumb Street. It bore no license plate but one tag lay upon the back seat. A picture of it was identified by Mr. Moore and other witnesses as fairly representing the Volkswagen observed at the lumber mill. The officers, after interviewing its registered owner, interviewed the defendant Wilkins who voluntarily produced from his pocket keys which fit the Volkswagen. Two ladies' stockings, one knotted, found under the passenger seat of this Volkswagen, were identified by Mr. Moore and Mr. Britt as similar to those worn by the robbers.

Wilkins was then arrrested and taken to the sheriff's office. Thomas, found in his company by the officers, was not then arrested but the officers requested him to go to the office for questioning, which he did. Mr. Moore was also requested to go to the sheriff's office to give the officers further information, which he did, as did Mr. Britt. Neither of them had previously mentioned Thomas' name to the officers. At the sheriff's office, Mr. Moore saw Thomas in the lobby and told the deputy he was one of the robbers. Thereupon, Thomas was arrested.

Prior to trial, the defendants moved to suppress evidence of identification. Thereafter, the case came on for trial at which the presiding judge, Browning, J., conducted a voir dire and made findings of fact. That trial resulted in a mistrial for reasons not appearing in the present record. At the trial from which the present appeal is taken, presided over by Tillery, J., the findings of fact so made by Browning, J., were adopted by Tillery, J. The evidence at the voir dire, conducted by Browning, J., was to the following effect:

Mr. Moore testified to the circumstances of the robbery and to his observation of the Volkswagen and its occupants substantially as set forth above. He then testified that approximately an hour after the robbery he went to the sheriff's office at the request of the sheriff who wanted to ask further questions about the robbery. While he sat in the office of one of the deputies, he saw Thomas sitting in the lobby and Wilkins drinking at the water fountain therein. Then, when the deputy asked him to describe the robbers, Mr. Moore told the deputy that he had just seen them in the lobby. No one had suggested to him that the two men were suspects or that any suspect had been arrested. Subsequently, the officers showed Mr. Moore photographs, among which he identified a photograph of Thomas but did not identify one of Wilkins. No suggestion was made to him as to any person or photograph whom or which he should identify. He testified that his identification of Wilkins as the driver and Thomas as the passenger was based on his observation of them in the Volkswagen five minutes before the robbery and he is positive they are those men. He recognized Wilkins in the lobby of the sheriff's office by his clothing, protruding lips and hair on his face.

Mr. Britt testified at the voir dire substantially as above stated concerning his identification of the defendants. When he observed Wilkins in the driver's seat of the car prior to the robbery, he saw him very well as Wilkins looked straight at Mr. Britt. He is quite sure that Wilkins was the driver. He recognized Thomas, notwithstanding the stocking mask, being within four or five feet of Thomas and looking straight into his face. He is quite sure that Thomas was one of the robbers on the basis of what he saw at the robbery. He did not see either Thomas or Wilkins at the sheriff's office. He was shown some photographs without any indication as to which one he ought to

identify. From these he picked out a picture which he said looked like Thomas, whose name he did not at that time remember.

Deputy Sheriff Flowers testified that immediately after the robbery he got from Mr. Moore a general description of the robbers. Thereafter, the defendant Wilkins was arrested and taken to the Sheriff's Department. Shortly thereafter, about an hour and a half after the robbery, Mr. Moore came to the sheriff's office and was invited to have a seat in the private office of the Chief Deputy, Mr. Britt being also therein. Mr. Moore sat with his back to an open door leading to the lobby. Mr. Britt sat looking at the floor. As they so sat, Wilkins was brought through the lobby en route to an interrogation room from the jail for further questioning and stopped at the water fountain to get a drink. Without any known reason for his doing so, Mr. Moore turned and saw Wilkins drinking at the water fountain. No one had told him anyone was under arrest for the robbery. No officer had arranged for any confrontation between Mr. Moore and Wilkins. When Mr. Moore observed Thomas in the lobby, Thomas was free to go wherever he pleased. After he saw the two men, Mr. Moore advised Deputy Flowers he was very sure he had seen both of them in the Volkswagen just prior to the robbery. Thereupon, Thomas was arrested. As he brought Wilkins into the lobby, Deputy Flowers knew that Mr. Moore and Mr. Britt were then in the sheriff's office. He did not "take any particular safeguards" to eliminate the possibility of a viewing of Wilkins by Mr. Moore, except that, as he walked ahead of Wilkins, he glanced into the office where Mr. Moore and Mr. Britt were and observed that Mr. Moore had his back turned to the door and Mr. Britt was staring down at the floor.

Deputy Stocks testified that after Mr. Moore had so identified the defendants at the sheriff's office, he was shown two groups of eight photographs, each group contaning the picture of one of the defendants. The photographs were chosen for similarities of the subjects. No suggestion was made to Mr. Moore or Mr. Britt as to which photograph was that of a suspect. Mr. Moore picked the photograph of Thomas and said that Thomas was one of those who had robbed him. He did not identify the photograph of Wilkins. Neither Mr. Moore nor Mr. Britt ever identified a photograph of anyone else as being a photograph of one of the robbers. Nothing on any of the photo-

graphs would have aided either Mr. Moore or Mr. Britt in making such identification.

Judge Browning made, and Judge Tillery adopted as his, detailed findings of fact as to the opportunities of Mr. Moore and Mr. Britt to observe the defendants at the lumber mill and as to their previous acquaintance with the defendant Thomas. These findings were in accord with the above mentioned evidence. The court further made findings as to the arrest of the defendant Wilkins by the investigating officer and found "that Wilkins had been in a holding area of the jail and that Wilkins was being escorted for further interrogation when he stopped at a water fountain; that the witness Moore turned around and looked at the defendant Wilkins for ten to fifteen seconds; that at the time the witness Moore did not know any persons accused of the crime were in custody; that no suggestion had been made to Mr. Moore that he should look and identify the person at the water fountain as being a person who robbed him; that about the same time the defendant Leroy Thomas was seated in the lobby of the Sheriff's Department and the witness Moore saw him seated in that position; that at that time the defendant Thomas was not under arrest; that at the time the witness Moore identified both the defendant Thomas and the defendant Wilkins as being persons who perpetrated the robbery; that thereafter the witness Moore was shown photographs of the two defendants in a photographic type lineup which included black males of similar characteristics; that of the photographic lineups the witness Moore failed to choose any of the persons who perpetrated the robbery; that the defendant Thomas' and the defendant Wilkins' photographs were included in the photographic lineup; that the witness Britt was also shown the same pictures for the possibility of identifying the subjects that had robbed him and that of the photographs which contained a picture of the defendant Thomas and the defendant Wilkins, that the witness Britt failed to identify either of those persons as the person that perpetrated the robbery."

Upon those findings of fact the court concluded that the identifications by Mr. Moore and Mr. Britt were made under circumstances such as did not violate the constitutional rights of either defendant; that Mr. Moore's identification of each defendant was based upon his having seen that defendant at the lumber yard on the date of the robbery, not upon the photographic procedures or upon seeing either of the defendants at

State v. Thomas

the Sheriff's Department. The court further found that the identification by Mr. Britt of each defendant was based upon Mr. Britt's having seen such defendant at the lumber yard on the date of the robbery and not upon the photographic lineup or the chance confrontation at the Sheriff's Department.

*Rufus L. Edmisten, Attorney General, by William F. O'Connell, Special Deputy Attorney General, for the State.*

*W. Dortch Langston for Defendant Thomas.*

*Louis Jordan for Defendant Wilkins.*

LAKE, Justice.

The evidence on the voir dire hearing fully supports the findings of the court that when Mr. Moore, seated in the office of a deputy sheriff, turned and saw Wilkins, as Wilkins drank from the water fountain in the lobby of the sheriff's office, Mr. Moore did not know that anyone, suspected of being a participant in the robbery, was in custody and that no suggestion was made to him that he should look at the person who was drinking at the water fountain to see if he could identify him as one of the robbers. The evidence at the voir dire hearing further supports the finding of the court that when Mr. Moore saw the defendant Thomas seated in the lobby of the sheriffs' office Thomas was not under arrest. There was no evidence to the contrary. No one told Mr. Moore Thomas was a suspect or suggested that Mr. Moore look at Thomas. These findings of fact are conclusive upon appeal. *State v. Legette*, 292 N.C. 44, 231 S.E. 2d 896 (1977) ; *State v. Yancey*, 291 N.C. 656, 231 S.E. 2d 637 (1977) ; *State v. Hunt*, 287 N.C. 360, 372, 215 S.E. 2d 40 (1975) ; *State v. Tuggle*, 284 N.C. 515, 520, 201 S.E. 2d 884 (1974) ; *State v. McVay* and *State v. Simmons*, 277 N.C. 410, 177 S.E. 2d 874 (1970).

The court's conclusions (actually, further findings of fact) that the in-court identifications by Mr. Moore of the two defendants were based upon his having seen them at the lumber yard and not upon his seeing them at the sheriff's office, or upon his inspection of photographs at the sheriff's office, are also supported by the evidence upon the voir dire examination and, therefore, are binding upon this Court. The court's further finding that the identifications of the two defendants by the witness Britt were based upon Mr. Britt's seeing the defendants

at the lumber yard and not upon his examination of photographs in the sheriff's office or upon any confrontation at that office are likewise so supported by the evidence at the voir dire hearing and conclusive upon appeal.

The uncontradicted evidence upon the voir dire hearing leads inescapably to the determination that the viewing of the two defendants by Mr. Moore at the office of the sheriff was not a confrontation planned by the officers. All of the evidence is to the effect that Mr. Britt, seated in the same room with Mr. Moore, did not see either of the defendants as they sat in or passed through the lobby of the office or see them elsewhere at the sheriff's office. All of the evidence is to the effect that no effort was made by any police officer to direct the attention of either Mr. Moore or Mr. Britt to either of the defendants. Neither witness had been told that any suspect had been taken into custody. The lobby of the sheriff's office is a public place. Thomas was actually not in custody but was free to go when and where he chose. Wilkins was in custody and was accompanied by a deputy sheriff, but there is nothing to indicate that he was handcuffed or otherwise under visible restraint. Mr. Moore and Mr. Britt had been requested by the sheriff to come to his office, not to identify anyone suspected of participation in the robbery but for the purpose of giving the officers further information concerning the offense and the participants therein. Not more than two hours elapsed between the robbery and the unexpected viewing of the defendants in the sheriff's office by Mr. Moore. There was nothing suggestive about the confrontation except the locality in which it occurred. We do not deem this sufficiently conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice—the test of due process. *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed. 2d 402 (1969); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967); *State v. Yancey,* supra.

If, however, the circumstances under which Mr. Moore saw the two defendants in the lobby of the sheriff's office could be deemed so unnecessarily suggestive as to make that confrontation a violation of the constitutional right of either of the defendants, it does not follow that the identification of both of them by either or both of these witnesses was improperly admitted before the jury. The witness Britt did not see either

defendant in the sheriff's office and no effort was made by the officers to have him do so.

The evidence on the voir dire hearing was to the effect that after Mr. Moore had identified both defendants at the sheriff's office as participants in the robbery, the defendants were photographed and these photographs, along with others of persons similar in appearance, were exhibited to Mr. Moore and to Mr. Britt. Neither identified the photograph of Wilkins. Mr. Moore identified the photograph of Thomas, whom he had already pointed out in person as one of the robbers, but Mr. Britt was not able to do so with certainty. Consequently, the photographs viewed by these witnesses did not contribute to their in-court identification of the defendants as participants in the robbery.

In *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974), speaking through Justice Branch, we said:

> "The practice of showing suspects singly to persons for purposes of identification has been widely condemned. *Stovall v. Denno, supra; State v. Wright* [274 N.C. 84, 161 S.E. 2d 581 (1968)]. However, whether such a confrontation violates due process depends on the totality of the surrounding circumstances.

> *        *        *

> "Our Court has held that there was no violation of due process when there were 'unrigged' courtroom and station house confrontations which amounted to single exhibitions of the accused. *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884; *State v. Bass* [280 N.C. 435, 386 S.E. 2d 384]; *State v. Haskins* [278 N.C. 52, 178 S.E. 2d 610]; *State v. Gatling,* 275 N.C. 625, 170 S.E. 2d 593. Similarly, we have recognized that a confrontation which takes place when a suspect is apprehended immediately after the commission of the crime may be proper. *State v. McNeil* [277 N.C. 162, 176 S.E. 2d 732].

> *        *        *

> "It is well established that the primary illegality of an out-of-court identification will render inadmissible the in-court identification unless it is first determined on voir dire that the in-court identification is of independent origin."

In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed. 2d 401 (1972), the Supreme Court of the United States, speaking through Mr. Justice Powell, held there was no violation of the defendant's constitutional rights in permitting an in-court identification by the victim of the alleged criminal offense, notwithstanding a pretrial identification of him by the victim at an out-of-court confrontation, the defendant being the only person then viewed by the witness. The Court said:

"In *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967 (1967), the Court held that the defendant could claim that 'the confrontation conducted * * * was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.' Id., at 301-302, 18 L.Ed. 2d 1199. This, we held, must be determined 'on the totality of the circumstances.'

\* \* \*

"Subsequently, in a case where the witnesses made in-court identifications arguably stemming from previous exposure to a suggestive photographic array, the Court restated the governing test:

'[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S. 377, 384, 19 L.Ed. 2d 1247, 88 S.Ct. 967 (1968).

\* \* \*

"Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S., at 384, 19 L.Ed. 2d 1247, 88 S.Ct. 967. * * * Suggestive confrontations are disapproved because they increase the likelihood of misidentification and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as

Stovall makes clear, the admission of evidence of a showup without more does not violate due process.

\*     \*     \*

"We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

[1] Considered in the light of the totality of the circumstances, in the present case, we think it clear that the in-court identification of each of the defendants by each of the witnesses, Mr. Moore and Mr. Britt, had its origin in their observations of the defendants at the scene of the robbery immediately before and during its prepetration and were not tainted by the unintentional, unplanned confrontation of the defendants by Mr. Moore in the office of the sheriff, or by the viewing by either Mr. Moore or Mr. Britt of photographs at the sheriff's office.

The trial court's findings of fact support the conclusion that the in-court identifications of the two defendants by Mr. Moore and Mr. Britt were competent evidence and were properly admitted over objection. Consequently, there was no error in allowing the in-court identification of the defendants by these witnesses as participants in the robbery, notwithstanding the unarranged confrontation at the sheriff's office. *State v. Tuggle,* 284 N.C. 515, 201 S.E. 2d 884 (1974) ; *State v. Bass,* 280 N.C. 435, 186 S.E. 2d 384 (1972) ; *State v. Haskins,* 278 N.C. 52, 178 S.E. 2d 610 (1971) ; *State v. Gatling,* 275 N.C. 625, 170 S.E. 2d 593 (1969).

The failure of both witnesses to recognize and identify the photograph of the defendant Wilkins at the sheriff's office and the then uncertainty of Mr. Britt as to the photograph of the defendant Thomas were brought to the attention of the jury through the cross-examination of these witnesses by the defendants. Otherwise, there was no reference to the photographs

in the evidence presented before the jury. This went to the credibility of their in-court identifications of the defendants, not to their competency. *State v. Bass, supra.*

[2]  Obviously, there is no merit in the contention of each defendant that, as to him, a judgment of nonsuit should have been entered. The evidence is abundant to show that a robbery was committed, as alleged in the indictment, and that each defendant was a participant therein. It is axiomatic that "[U]pon motion for nonsuit, the question for the court is whether, upon consideration of the evidence in the light most favorable to the State, there is reasonable basis upon which the jury might find that the offense charged in the indictment has been committed and the defendant was the perpetrator or one of the perpetrators of the crime." *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976). *Accord: State v. Yancey,* 291 N.C. 656, 231 S.E. 2d 637 (1977); *State v. Bell,* 285 N.C. 746, 208 S.E. 2d 506 (1974). So considered, the uncontradicted evidence for the State is sufficient to show: The robbery was committed. Five minutes earlier Wilkins and Thomas were in a black Volkswagen immediately outside the office where it occurred. The robbers wore shirts similar in appearance to those then worn by Wilkins and Thomas. One of them wore conspicuous gloves, similar in appearance to gloves worn by Wilkins five minutes before the robbery. Thomas was one of the robbers. The robbers left the scene in the same Volkswagen, the keys of which Wilkins had in his pocket one hour later. The robbers left at the scene a pistol owned by Wilkins' brother with whom he lived.

[3]  In reviewing the evidence in his charge to the jury, the judge said that Mr. Moore had testified that two of the robbers were wearing "the same two shirts" which he had observed on Wilkins and Thomas as they sat in the Volkswagen some five minutes prior to the robbery. Actually, Mr. Moore testified that two of the robbers were wearing shirts of the same type as those he had observed on Wilkins and Thomas as they sat in the Volkswagen. We do not think that this variance between the evidence and the judge's summary of it was of any substantial consequence, but, in any event, it is sufficient to note that neither defendant called this error to the attention of the court before the jury retired to consider its verdict. Their failure to do so renders this assignment of error of no avail. *State v. McAllister,* 287 N.C. 178, 185, 214 S.E. 2d 75 (1975); *State v. Tart,* 280 N.C. 172, 184 S.E. 2d 842 (1971); *State v. Virgil,* 276 N.C.

217, 230, 172 S.E. 2d 28 (1970) ; *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469 (1968).

**[4]** There is no merit in the contention that the court, by its instructions, put undue pressure upon the jury to reach a verdict. After retiring and considering the case for some four hours, the jury returned to the courtroom and reported that it had not reached a verdict as to the defendant Thomas, thus implying that it had reached a verdict as to Wilkins. The court sent the jury back to consider the case further, saying:

> "I'm sure all of you know without me saying what it will mean if you are ultimately unable to agree in your verdict. It would mean that the matter would have to be retried. It would mean that some other jury would have to be chosen. It would mean that another week would have to be calendared for the trial of the case. I don't want to force or coerce any of you into trying to reach a verdict that your consciences forbid you to reach, but it is your duty, ladies and gentlemen, to do everything as reasonable men and women to try to reconcile your differences. You've heard all the evidence in the case, and, of course, a mistrial would mean that some other jury would have to do it all over. I realize sometimes there are times when juries cannot agree and it ultimately turns out that's how it stands, so be it, but I am asking, I am going to ask you to go back to the jury room and in the light of what I have said to you and commune together again for a while if you will and see if you can come to some agreement and with that please try again."

This instruction clearly informed the jurors that the court was not seeking to coerce any of them into a verdict contrary to his or her conscience. It left the jurors free to disagree and thus return no verdict. It left them as free to reach an agreement upon a verdict of "not guilty," as upon a verdict of "guilty." At the time the instruction was given, the court had no information as to how the jury stood with reference to the defendant Thomas, whether the majority believed him guilty or not guilty. The further deliberations requested by the court might well have resulted in a verdict of "not guilty" as to Thomas, which would have been far more beneficial to him than a mistrial. We find in this instruction no basis for a new trial as to Thomas. Obviously, it was not prejudicial to Wilkins,

for the clear indication was that the jury had already agreed upon its verdict as to him.

It is said in 4 Strong, N. C. Index 3d, Criminal Law, § 122.2, "Generally, where the jury have retired but are unable to reach a verdict, the court may call the jury back and instruct them as to their duty to make a diligent effort to arrive at a verdict, so long as the court's language in no way tends to coerce or in any way intimate any opinion of the court as to what the verdict should be." Instructions similar to that of which the defendants here complain were found to be free from error in *State v. McVay* and *State v. Simmons,* 279 N.C. 428, 433, 183 S.E. 2d 652 (1971) ; *State v. Barnes,* 243 N.C. 174, 90 S.E. 2d 321 (1955) ; and *State v. LeFevers,* 216 N.C. 494, 5 S.E. 2d 552 (1939).

[5]  After the jury had retired and begun its deliberations, it returned to the courtroom and requested the court to have the court reporter read a specified portion of the testimony on direct examination of Mr. Moore. This the court permitted to be done. The defendant Wilkins assigns as error the denial of his request that the testimony of the witness Moore on cross-examination be read to the jury. In this we see no error justifying the granting of a new trial. The defendants do not challenge the accuracy of the reporter's reading. The record does not disclose any testimony of Mr. Moore on cross-examination which was in conflict with or in contradiction of the testimony on direct examination so read back to the jury in response to its request. While we do not approve the practice of having read back to the jury the testimony of a witness as recorded by the court reporter, this assignment of error is not directed to that ruling but to the court's refusal to have read back the evidence given by this witness on cross-examination. In this instance, no prejudice to the defendant Wilkins by this refusal of his request is shown.

Other assignments of error by the defendants have been carefully considered by us and we find no merit therein. It would serve no useful purpose to discuss these in detail.

No error.