STATE OF NORTH CAROLINA v. SEBRINA DAVIS FREEMAN

No. 65

(Filed 6 June 1978)

1. Criminal Law §§ 75.9, 75.10— volunteered statements—statement made after rights waived—admissibility

The trial court in a homicide case properly allowed into evidence defendant's incriminating statements which an officer testified were made to him at the scene of the fire where the victim was burned and which another officer testified defendant made to him at the police department, since the statements made at the scene of the crime were volunteered; the officer's request for an explanation as to what defendant meant by one of her statements did not transform the situation into an interrogation necessitating warnings or waivers; and the statements made by defendant at the police station were made only after defendant was fully advised of her rights and she voluntarily waived those rights.

2. **Homicide § 21.7— second degree murder—burning of victim—sufficiency of evidence**

Evidence was sufficient to sustain defendant's conviction of murder in the second degree where it tended to show that defendant and her husband had a fight during which defendant hit her husband with an ax; the husband's jaw was fractured and several teeth were knocked out; a neighbor saw smoke coming from defendant's house and went to investigate; he saw the husband lying on a bed and both the husband and the bed were burning; only the area around the bed was burning; defendant was standing just inside the room looking at her husband as he lay on the bed in flames; there was a tub of water near defendant but she did not use it to extinguish the fire, even after being instructed to do so by the neighbor; immediately before and at the time of the fire, defendant and her husband were the only persons in the house except for defendant's small baby; and the physical facts at the scene of the crime did not correspond with defendant's account of what happened.

3. **Criminal Law § 163.2— exception to charge as given—proper instruction must be set out**

When an appellant excepts to the inadequacy of the court's instruction on a particular point, in contrast to the court's failure to give any charge on the subject, appellant must set out the substance of the inadequacy, that is, substantially supply the omission which he contends rendered the charge insufficient. N.C. App. R. 10(b)(2).

4. **Homicide § 23.2— proximate cause—jury instruction proper**

In a homicide prosecution the trial court's instruction with respect to proximate cause was proper where the court defined proximate cause as "a real cause, a cause without which [deceased's] death would not have resulted."

5. **Criminal Law § 168.5— jury instructions—misstatement of evidence—harmless error**

The trial court's misstatement of one of the State's contentions with reference to a witness's testimony, to which defendant did not call the court's attention, was not of sufficient consequence to affect the verdict.

APPEAL by defendant under G.S. 7A-27(a) from *-mall, J.,* at the 6 June 1977 Session of the Superior Court of BEAUFORT, docketed and argued as Case No. 74 at the Fall Term 1977.

Defendant, Sebrina Davis Freeman, was tried upon a bill of indictment, drawn under G.S. 15-144, in which she was charged with the murder of her husband, Donnie Freeman. She was convicted of murder in the second degree and appeals the sentence of life imprisonment imposed upon the verdict.

By a stipulation between defense counsel and the district attorney, it was established that Donnie Freeman died on 1 March 1977 as the result of extensive burns received on 9 January 1977.

During that afternoon Donnie Freeman (Donnie) was brought to the Pungo District Hospital badly burned, semi-conscious, and in shock. His right jaw had been fractured; several of his teeth were missing, and several were loose. Approximately 80-85% of his body had received second and third-degree burns. Blood from the injuries to his right jaw had been aspirated into the lungs and sucked into the stomach. He was in critical condition and unable to communicate. Arrangements were made immediately to transport him to the North Carolina Memorial Hospital at Chapel Hill, where he remained until his death.

Evidence for the State, summarized except when quoted, disclosed the time and manner in which Donnie's injuries were received.

On the afternoon of 9 January 1977, James Spencer was visiting in Belhaven at the home of a friend who lived directly across the street from the residence of defendant and Donnie Freeman on the corner of King and Duke Streets. Observing a fire in defendant's home, Spencer crossed King Street and peered into defendant's bedroom window. Near the window he saw Donnie lying on his back in the bed "with a lot of fire around him." Both the bed and Donnie Freeman were on fire. The area around the bed was burning, but he observed no burning about the stove or elsewhere in the room. When Spencer peeked through the window Donnie "was trying to mumble out something." Spencer also observed defendant standing up beside the wall next to the door in the room where the fire was. She was standing still, with her baby on her hip, facing the man on the bed. As Spencer ran into the house he saw in the hall, a short distance from defendant, a tub about half full of water. Defendant made no response when he told her to pour the water on Donnie while he went to call the fire department. At that time only he and defendant were in the house. Spencer's sister, Annie Clayton, went in a short time later. After he had returned from calling the fire department he went with her to the door, but there was too much smoke for him to enter.

In spite of the smoke, however, Annie Clayton went in the front door. In the bedroom she saw that "the man was still lying on the bed burning." He was lying on his back "and his clothes were on fire." He was completely on the bed. Mrs. Clayton

State v. Freeman

testified that there was so much smoke she was afraid to enter the room, but she called to the man to crawl out. He started getting up and she went back outside. There she saw defendant in the yard.

The auxiliary Chief of Police of Belhaven, Guy Larry Satterthwaite, received a report of the fire about 1:55 p.m. and three minutes later he arrived at defendant's home. He saw smoke coming from the roof area next to King Street and, as he walked to the house, he observed Donnie crawling from the doorway. "All the clothes he had left on" were still burning, but most of his clothing had been burned away. Satterthwaite pulled off his own shirt, beat out the fire, and ran back to his car to call the rescue squad. He then returned to Donnie and, while he and Annie Clayton were removing the smoldering remnants of Donnie's clothing, "defendant was hollering and came running to where [they] were." Prior to that time Satterthwaite had not seen defendant, and later he "did not see her assist her husband in any manner." Satterthwaite's testimony with reference to his encounter with defendant follows:

"I was in uniform when I went to the defendant's residence. The defendant ran up to me and said, 'God, I didn't mean for it to happen,' or 'God, I didn't mean it. . . . I didn't mean for it to happen like this.' I asked her who she was and what she meant by that statement. She told me that she was his wife and that they were having a fight. She told me that she hit him with the axe and that he fell over the kerosene jug and knocked it in the heater and then the kerosene caught afire. She told me that her husband was unconscious and that she tried to drag him out of the room but he was too heavy. She said that she ran out of the room and outside the house when she saw a man and a woman come by on a bicycle. She tried to get them to go into the house and help her but it was so smoky then that they could not get in the room. I told her to get in my car and I would carry her to the hospital. She was not in custody or under arrest at that time. She was asking to go to the hospital at that time and I offered to carry her."

When asked to describe defendant's behavior at the time she made the foregoing statement it was Satterthwaite's opinion that " she was not any more excited than [he] was." He said, "It was an emotional situation, particularly if you are not used to that type of excitement."

At the hospital Dr. Charles O. Boyette, who was attending Donnie, told defendant that her husband's condition was "critical" and he did not think he would live. He then asked her what happened and she replied "that she and her husband had a fight and she hit him with an axe and he fell across the heater." The doctor said that at that point, having perceived "there were possibly some complications in there that were not medical," he did not pursue the matter further.

At Officer Satterthwaite's request, defendant went from the hospital to the police department. There she talked with Captain Bruce L. Smith. He summarized her account of events preceding the fire substantially as follows:

Defendant and Donnie were fighting. She had left him three days before Christmas and returned sometime after New Year's. She was two months pregnant and Donnie wanted her to have an abortion. They kept arguing while both were working on a portable kerosene heater in which "the flame kept blazing up." When Donnie tried to hit her she grabbed an axe and hit him two times with it. In this struggle a jug of kerosene was upset. Kerosene was spilled on the floor and started blazing. She ran out and left Donnie lying on the floor with his shirt on fire. "She and another man tried to get him out of the house, but could not because Donnie was on fire."

At one time during their conversation Captain Smith said defendant "started to cry, but she quit. She kept asking what was going to happen to her. She did not say anything about the condition of her husband. She did not ask me one time how her husband was." Defendant was arrested immediately after she completed her statement to Captain Smith.

Doctor Boyette, who had treated Donnie at the hospital, happened to own the house in which defendant and Donnie were living on 9 January 1977. He inspected the property about 5:00 p.m. that day at which time he observed that the window facing King Street was broken out and a bed was burning "immediately under the window." Inside, in the "nearly square" room, which was "approximately twelve feet by twelve feet," he found a wood heater seven or eight feet from the smoking bed. A few inches from the wood heater and six to eight feet from the bed was an old kerosene portable heater standing upright with the lid open. "The

most extensive burning appeared to be in the northwest corner of the room and particularly on the bed under the window facing King Street." The burning "was approximately twice as extensive in the corner of the room where the beds were located . . . as opposed to any other area of the room." The "evidence of burning about the region of the heater" consisted of "charred fragments of board on the floor which had come from the ceiling." It appeared to Dr. Boyette that "the ceiling above the bed along the King Street wall was more extensively damaged than anywhere else." The top layers of the mattress on that bed were also burned extensively. There was not as much damage to the bottom of the mattress. . . ."

About 7:00 p.m. on 9 January 1977 Mr. Samuel Collins, "the maintenance man for Dr. Boyette's rentals," inspected the defendant's residence. At that time he found the bed under the King Street window still smoldering and the bed next to the Duke Street wall in flames. The wall behind the heater was burned badly, but no part of the floor had been burned. However, there were cinders around the heater from the badly burned ceiling above. .

Collins had been in this house many times before and as he entered the hall he saw a jug half full of kerosene about ten or twelve feet down the hall from the door to the burned room. He had seen this jug of kerosene in the hall many times before. In his opinion that was where defendant kept her kerosene. He emptied the jug and called the fire department to return to the scene and extinguish the fire which had flared up again after the fire truck left the scene. Collins later tore the house down.

Defendant's evidence consisted of her own testimony and that of her sister, Novella Thomas. Defendant's testimony tended to show:

At the time of the trial defendant was twenty-one years old. She first met Donnie in September 1975 when he was in the Marine Corps, and she had lived with him from September to December that year. They were married on 2 December 1976. At that time she had two children, a four-year old girl and a two-year old boy. Donnie was not the father of either. Donnie's family and friends did not approve of his marriage to defendant, and they had let him know they thought him a fool for having married her. This implication upset him greatly. "Marital problems" developed.

On 23 December 1976 defendant left him because he was beating her and her children. However, she returned a few days before 9 January 1977.

On the day of the fire defendant and Donnie were arguing in their bedroom. She was pregnant. He wanted her to have an abortion and she was unwilling. Donnie was also concerned because she had not brought all her children's clothing when she returned home. He suspected that she did not intend to stay, and she assured him she would not stay if he continued to beat on her. During this altercation he threw her on the iron bed, beat her with his fists, and banged her head against the metal part of the bed. Donnie was six feet tall and weighed about 185 pounds. When he released her she brought the oil heater from the living room into the bedroom to burn off the wick so it would not smoke. Upon her return she found Donnie burning her children's toys in the wood heater.

As she worked with the wick in the oil heater Donnie started "cussing," and she attempted to calm him by telling him to give her his socks so that she could wash them with a pair of his pants she already had in a tub on the wood heater. He threw her the socks; she put them in the tub and left the room. Upon her return, the wash tub was outside the door and Donnie "got on her again" about his family calling him a fool. He threatened to kill defendant and threw her against the wall. He then began pulling her hair and beating her head against the wall. When she fell to the floor he kicked her in the stomach, all the while threatening to kill her and his unborn child. As a result of this assault her mouth was bleeding inside and her lip swelled. She also had scars around her neck where Donnie had choked her.

When he let her up defendant stood next to the door into the hall. At that time she said there was nothing to keep her from running into the hallway and on to Duke Street except that she was scared. As she stood there she saw Donnie look toward a paring knife on top of the TV stand beside the iron bed. She does not know whether he ever moved toward the knife for she then grabbed the axe located beside the chimney, hit Donnie, and ran out of the room. When she swung at him she "did not attempt to hit him in any particular place." She just "swung," hoping to slow him down, because she was scared, and because "immediately

before [she] hit him he kept saying he was going to kill [her]." She did not then know that she had hurt him. She ran to the kitchen where she hid the axe in a corner.

After she had been in the kitchen for several minutes defendant heard some people hollering across the street and went back to the room. Her account of the events which followed is quoted below:

"My child was in the hallway. I pushed the door open and the room was on fire and my husband was lying on the floor on fire. I did not see the kerosene heater at this time but the kerosene jug had been spilled over on the floor. The kerosene jug had rolled over in the front of the wood heater. The only place that was on fire at that time was the floor and Donnie. The South wall against the kitchen was not on fire at that time. I picked up the kerosene jug and took it to the kitchen and picked up two water jugs and went back to the burning room. When I got to the door of the room a man and a woman came in and asked if there was anybody else in the house. I asked the people for help and I wanted to pour the water on my husband but the man would not let me because he said he was on fire. I do not remember who the man was but I know it was not James Spencer. Mrs. Annie Clayton picked up my son and took him outside. The man pulled me by the arm outside and I laid the water jugs down. The last time I saw my husband he was lying on the floor."

On cross-examination defendant said, "[W]hen I heard some people in the street hollering something about a fire, I ran back to our room and I saw Donnie lying on his stomach on the floor and his clothes were on fire. When I walked in the room I saw the keorsene jug turned over in front of the wood heater. I picked up the jug and took it out of the room. . . . There was no fire immediately around the jug. I did not see any kerosene spilled on the floor. . . ."

Defendant testified that she did not "remember making any statement like the one Officer Satterthwaite said [she] made"; that she was crying, shaky, and very upset at that time. She did remember telling both Officer Smith and Dr. Boyette that she and defendant were fighting and that she hit him with the axe. She said, however, that she only swung one time and that she had also

told Officer Smith about Donnie beating her head against the bed and wall. She denied pouring any kerosene on Donnie.

After defendant's arrest on 9 January 1977 she remained in the Beaufort County jail until her sister, Mrs. Thomas from Norfolk, posted bail for her on January 30th. On that day she went to Norfolk where she remained until she was returned to the Beaufort County jail after Donnie's death.

Mrs. Thomas testified that when she visited defendant in jail on January 10th she saw "scars or finger marks" on her neck and bruises on her stomach. She also observed that defendant's lip was split inside her mouth.

The State's rebuttal evidence consisted of the testimony of Captain Smith and Iris Leary, a female police officer. Captain Smith testified that on January 9th he was in defendant's presence at the jail for two and one-half hours and that he observed no scars on defendant's person. He did see "two small dots around defendant's right eye," which might have been skinned places. Officer Leary testified that she conducted a "strip search" of defendant at the jail on January 9th and that she observed no bruises, cuts, or abrasions on her body, neck or face. Defendant made no complaints about having been injured.

Other facts pertinent to decision will be stated in the opinion.

*Attorney General Rufus L. Edmisten and Special Deputy Attorney General William F. O'Connell for the State.*

*Franklin B. Johnston for defendant appellant.*

SHARP, Chief Justice.

In appellant's brief counsel has grouped seventy-four assignments of error within the framework of eight questions. Of these questions we will consider only three. The other five encompass assignments which are either patently without merit or challenge miniscule errors which are harmless beyond a reasonable doubt. Any discussion of these questions would necessarily be (1) a mere repetition of the well-established rules regarding the sound discretion of the trial judge as to the allowance of leading questions and the scope of cross-examination, and (2) a wordy demonstration that the testimony challenged as

"opinion evidence" is actually a "shorthand statement of fact," and that the statements alleged to be hearsay are in fact spontaneous utterances, declarations accompanying an act, or a part of the *res gestae*. In this case, we have decided not to add to the surplusage of such discussions already in the books.

[1] We first consider the questions challenging the trial judge's rulings admitting in evidence defendant's incriminating statements which Officer Satterthwaite testified were made to him at the scene of the fire and which Captain Smith testified defendant made to him at the police department. When defendant objected to the introduction of these statements Judge Small properly conducted a *voir dire* at which he heard the testimony of both the officers and defendant.

The testimony which Satterthwaite gave before the jury with reference to defendant's statement to him, and the circumstances under which it was made, is set out in our preliminary statement of the evidence. His testimony on *voir dire* was substantially the same. Defendant, however, testified that she had no recollection of making any statement to Satterthwaite except a request that he take her to the hospital. Judge Small, however, found the facts in accordance with Satterthwaite's testimony and permitted him to relate to the jury what defendant said to him when he encountered her at the scene of the fire. *See State v. Harris*, 290 N.C. 681, 693-94, 228 S.E. 2d 437, 444 (1976).

Defendant's statements to Satterthwaite at the scene of the fire were clearly admissible. She was not in custody when she approached Satterthwaite and volunteered the statements in question. Therefore, neither *Miranda* warnings nor the correlative waiver of rights were necessary prerequisites to admissibility. *State v. Strickland*, 290 N.C. 169, 184, 225 S.E. 2d 531, 542 (1976). Further, "volunteered and spontaneous statements made by a defendant to police officers without any interrogation on the part of the officers are not barred in any theory of our law." *State v. Biggs*, 292 N.C. 328, 334, 233 S.E. 2d 512, 515 (1977). *Accord, State v. Bell*, 279 N.C. 173, 181 S.E. 2d 461 (1971). Nor did Satterthwaite's request for an explanation as to "what she meant by that statement," transform the situation into an interrogation necessitating warnings or waivers. *State v. McZorn*, 288 N.C. 417, 432-33, 219 S.E. 2d 201, 211 (1975), *death sentence vacated*, 428

U.S. 904, 49 L.Ed. 2d 1210, 96 S.Ct. 3210 (1976); *State v. Haddock*, 281 N.C. 675, 682, 190 S.E. 2d 208, 212 (1972).

As to the statements which Captain Smith testified defendant made to him at the police station, she denied only that she told him she hit Donnie twice with the axe. She insisted she told Smith that after Donnie had beaten her head against the bed and the wall she hit him *once* with the axe.

Upon direct examination on *voir dire* defendant testified, "the first thing he [Captain Smith] did was to read my Miranda rights." She also testified, "I told Officer Smith that I wanted to make a statement to him but I did not understand that I had a right to have an attorney present at that time." Notwithstanding, on cross-examination, she testified, "I understood that I did not have to say anything if I did not want to. . . . I knew that I could have a lawyer. I told Officer Smith I guess I understand my rights. As far as I can remember, I guess I agreed to make these statements without the presence of an attorney."

Captain Smith also testified on *voir dire* that before asking defendant any questions he read her the *Miranda* warning and then asked her if she understood each of her rights. She said that she did, but requested him to "repeat the number six item." Accordingly, he said to her again, "[I]f you decide to answer questions now without a lawyer present you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer." Smith then asked her once more if she understood. She said she did understand, and upon being asked whether she wished to make a statement without her attorney being present, she replied, "Yes, sir." In response to a specific inquiry Smith said, "I did not promise her anything or threaten or coerce her in any way to make a statement."

At the completion of the *voir dire*, Judge Small rejected defendant's contention that she was obviously "scared and confused and any statements made by her to police officers without the aid and counsel of any attorney should have been suppressed." He found that prior to interrogation Smith had fully advised defendant of her constitutional rights as required by the *Miranda* decision and that she fully understood her rights; that no officer offered her any inducement to talk or made any threat or

show of violence. His conclusion that "defendant intentionally, freely, voluntarily, knowingly and understandingly waived each of her constitutional rights prior to making a statement to Captain Smith . . . on 9 January 1977" is supported by plenary competent evidence. His findings and conclusions are, therefore, binding upon this Court. *State v. Williams*, 289 N.C. 439, 443, 222 S.E. 2d 242, 245, *death sentence vacated*, 429 U.S. 809, 50 L.Ed. 2d 69, 97 S.Ct. 45 (1976); *State v. Simmons*, 286 N.C. 681, 692, 213 S.E. 2d 280, 288 (1975), *death sentence vacated*, 428 U.S. 903, 49 L.Ed. 1208, 96 S.Ct. 3207 (1976).

[2] We next consider defendant's assignment that the court erred in refusing to grant her motion for a directed verdict of not guilty at the close of all the evidence. To this assignment we apply the long-established rule that in a criminal case upon a motion for nonsuit or directed verdict, the evidence is to be considered in the light most favorable to the State, which is entitled to the benefit of every reasonable inference of fact deducible from the evidence. *State v. Hall*, 293 N.C. 559, 561, 238 S.E. 2d 473, 474-75 (1977). The court is not concerned with the weight of the testimony but only with its sufficiency to sustain the indictment. Thus, if there is any evidence from which the jury could find that the defendant committed the offense charged, the motion should be overruled. The test of the sufficiency of the evidence to withstand a motion for a directed verdict is the same whether the evidence is direct, circumstantial, or both. *State v. McNeil*, 280 N.C. 159, 162, 185 S.E. 2d 156, 157 (1971).

Relating these principles to the evidence before us, we hold that the trial judge correctly denied defendant's motion for a directed verdict. The evidence adduced is sufficient to show the following facts:

On the afternoon of 9 January 1977, after a fight in the bedroom with deceased, Donnie Freeman, during which he beat her head against the bed and wall of their bedroom and threatened to kill her, defendant hit him twice with an axe. The blows broke deceased's right jaw, knocked out several teeth, and loosened several others. Thereafter, attracted by smoke coming from defendant's house, James Spencer peered into the bedroom window and saw Donnie lying in bed on his back surrounded by fire. Both Donnie and the bed were burning. Donnie was mumbling

and defendant was looking at him as she stood against the wall by the door, her baby on her hip. In the room only the area by the bed was burning. Upon seeing this sight, Spencer ran into the house. Observing a "foot tub" half full of water by the door, he told defendant to pour the water on Donnie and he would go call the fire department. She made no reply. Spencer left the house and told a neighbor to call the fire department. He then returned to the house. Spencer's sister, Mrs. Clayton, who had not gone into the house with him the first time he entered, came in after he had returned from the neighbor's. This time he went to the door but did not go into the bedroom because there was too much smoke.

When Mrs. Clayton entered the house she saw Donnie lying on his back in the bed, his clothes burning. Although afraid to enter the room because of the smoke, she called to Donnie to "crawl out," and when he started to get up she left the house. Mrs. Clayton never saw defendant in the house, but when she left the house she did see her in the yard.

Officer Satterthwaite arrived at the Freeman residence three minutes after receiving the report of the fire. At that time he observed Donnie crawling from the doorway. He immediately sent him to the hospital, where Donnie arrived semiconscious and severely burned over 80% of his body.

Other testimony from State's witnesses also tended to show that in the early stages of the fire the area by the bed on which Donnie was lying was the only portion of the room on fire, the most extensive burning then being on the bed; that the top layers of the mattress were badly burned; and that there was no sign of burning on the floor around the heater or the wall behind it.

The State's theory of this case is that defendant intentionally, unlawfully and maliciously struck her husband about the head with an axe, thereby inflicting serious injuries upon him; that while he lay stunned or unconscious on the bed she set him on fire after having poured kerosene on his clothing and on the bed; that, in consequence, he received the extensive burns which caused his death.

Defendant's statements to Officers Satterthwaite and Smith, as well as her own testimony, are pertinent to an evaluation of

the State's evidence and its theory of the prosecution. *Inter alia*, she told Satterthwaite that as Donnie lay unconscious *on the floor*, his clothes burning, she tried to drag him from the burning room. He was too heavy for her to move, however, and she could persuade no one to go into the burning room to help her. She told Captain Smith that during the struggle in which she hit Donnie with the axe *"one or the other* knocked the jug over and kerosene spilled on the floor and started blazing." (Italics ours.) She also stated to him that she ran out leaving Donnie on the floor with his shirt on fire after she and an unknown man had tried unsuccessfully to get him out of the house "but could not because Donnie was on fire."

All the evidence tends to show that immediately before and at the time the fire started defendant and Donnie were the only persons, except for defendant's small baby, in the house. Moreover defendant concedes: (1) that she struck Donnie with an axe at a time when there was nothing to keep her from running out the door into the public street except that she was "scared"; (2) that after she struck Donnie he was lying face down, helpless on the floor, his clothes on fire, and at that time the only fire in the room was on Donnie and the floor; (3) that she did not use available water to extinguish the fire which was burning Donnie and his clothes; and (4) that she did not drag him approximately nine feet into the hall because he was "too heavy." She denies that at the time James Spencer and his sister came into the house Donnie was lying on the bed and insists that the last time she saw him he was lying on the floor.

The State's evidence, however, tends to show: (1) that Donnie was on his back on the burning bed in the room where defendant struck him and where she said he fell unconscious to the floor; (2) that defendant was standing just inside the bedroom looking at him as he lay on the bed in flames; (3) that when all the fire was extinguished the mattress was "burned about half way down from the top"; and (4) that the floor where defendant said Donnie fell and was lying in flames was not burned, the only evidence of fire at that spot being cinders which had fallen from the ceiling.

From the foregoing it is clear that both circumstantial evidence and the direct testimony of State's witnesses contradicted the exculpatory assertions contained in defendant's

statements to the officer. Contrary to defendant's contentions, therefore, the introduction of these statements did not preclude the State from showing that facts concerning the crime charged were different from defendant's version. The rule is that "the introduction by the State of an exculpatory statement made by a defendant does not preclude the State from showing the facts concerning the crime to be different, and does not necessitate a nonsuit if the State contradicts or rebuts defendant's exculpatory statement." *State v. May*, 292 N.C. 644, 658, 235 S.E. 2d 178, 187 (1977), *cert. denied*, --- U.S. ---, --- L.Ed. 2d ---, --- S.Ct. --- (----).

The State's evidence, taken as true, is sufficient to negate defendant's contention that Donnie fell on the floor by the heaters when she struck him; that his fall accidently upset a jug of kerosene which was nearby; that the kerosene was ignited from the wick of the oil heater; and that Donnie was burned as he lay there on the floor. Circumstantial evidence will also support a finding that Donnie's clothing was ignited on the bed where Spencer and Mrs. Clayton saw him lying in flames and that defendant, as the only other occupant of the house at the time, started that fire.

We hold that the evidence in this case was sufficient to sustain defendant's conviction of murder in the second degree. *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975); *rev'd on other grounds*, 432 U.S. 233, 53 L.Ed. 2d 306, 97 S.Ct. 2339 (1977); *State v. Woods*, 278 N.C. 210, 179 S.E. 2d 358 (1971).

[3] Finally, we consider defendant's two assignments of error relating to the court's instructions to the jury. The first, "that the trial court committed reversible error . . . by failing to adequately define proximate cause to the jury," is a "broadside" which ignores the following requirement of N.C. App. R. 10(b)(2): "An exception to the failure to give particular instructions to the jury . . . which was not specifically requested of the trial judge shall identify the omitted instruction . . . by setting out its substance immediately following the instructions given. . . ." We interpret this rule to mean that when an appellant excepts to the inadequacy of the court's instruction on a particular point, in contrast to the court's failure to give any charge on the subject, appellant must set out the substance of the inadequacy, that is, sub-

stantially supply the omission which he contends rendered the charge insufficient. Notwithstanding defendant's failure to comply with this rule, we have carefully examined the charge and we find it to be entirely adequate on proximate cause.

[4]   At the beginning of his charge the judge correctly defined proximate cause as "a real cause, a cause without which Donnie Freeman's death would not have resulted." Thereafter, in his mandate with reference to second degree murder (the crime of which defendant was convicted), the judge instructed the jury as follows: "[I]f you find from the evidence beyond a reasonable doubt that on or about January 9, 1977 the defendant, Sebrina Davis Freeman, struck her husband with an axe and thereafter set him and his clothing on fire with malice and without lawful justification and excuse, as I have defined that term to you, thereby proximately causing the death of Donnie Freeman, it would be your duty to return a verdict of guilty of second degree murder. However, if you do not so find or if you have a reasonable doubt as to one or more of these things, you will not return a verdict of guilty of second degree murder." In his mandates on first degree murder and manslaughter, the other offenses included in the indictment drawn under G.S. 15-144, the judge gave practically identical charges with reference to proximate cause.

It is inconceivable that the jurors did not fully understand that before they could convict defendant of any degree of murder or of voluntary manslaughter, they first had to be satisfied beyond a reasonable doubt that Donnie died as the result of burns which defendant had intentionally and unlawfully inflicted upon him. In view of the stipulation that the burns which Donnie received on 9 January 1977 "were the direct and proximate cause" of his death, the crucial question in the case was whether defendant intentionally and unlawfully caused the burns.

[5]   Defendant's other objection directed to the judge's instruction is set out in her assignment No. 63. In stating the State's contentions the judge incorrectly stated that the State contended James Spencer and Mrs. Clayton, after looking into the window and seeing Donnie lying in flames on the cot, went into the house where *they* saw defendant holding her baby and standing in the room where her husband lay burning. In fact, the State did not

contend that *both* Spencer and Mrs. Clayton saw defendant standing in the room. Spencer testified that his sister, Mrs. Clayton, was not with him when he looked into the window and went in the house the first time; that she was in the house after he went to call the fire department. Mrs. Clayton testified that when she looked in the window and after she went into the house she saw the man lying on the bed burning; she said she had no recollection of ever seeing defendant in the house. Upon leaving the house she then saw defendant outside in the yard.

Notwithstanding, under the circumstances here disclosed, the court's inaccurate statement of the State's contention with reference to Mrs. Clayton's testimony cannot be regarded as of sufficient consequence to have affected the verdict. This must also have been defense counsel's view of the inaccuracy since he did not call the judge's attention to the misstatement at the time it was made. *See State v. McAllister*, 287 N.C. 178, 185, 214 S.E. 2d 75, 81 (1975); *State v. Tart*, 280 N.C. 172, 184 S.E. 2d 842 (1971); *State v. Cornelius*, 265 N.C. 452, 144 S.E. 2d 203 (1965). Before the inadvertent misstatement occurred the judge had made it quite clear that he was stating contentions. Further, at the conclusion of the charge, he told the jurors that his references to the testimony had not been made for the purpose of refreshing their recollections, and it was their duty to recall all the evidence. As Justice Lake noted with reference to a similar situation in *State v. Thomas*, 292 N.C. 527, 540, 234 S.E. 2d 615, 623 (1977): "We do not think that this variance between the evidence and the judge's summary of it was of any substantial consequence, but, in any event, it is sufficient to note that neither defendant called this error to the attention of the court before the jury retired to consider its verdict. Their failure to do so renders this assignment of error of no avail."

When the charge is read as a whole, it is clear that the trial judge gave defendant the benefit of every defense and principle of law to which she was entitled. He fully stated and correctly applied the law to the evidence tending to sustain her contentions that she struck her husband with the axe in lawful self defense; that he did not die from that blow, which felled him, but from burns accidently received thereafter; that in falling he had upset a jug from which kerosene was accidently ignited by the burning wick of a portable heater; that deceased's clothing then caught

fire but, because of his weight, and the fire and smoke in the room, she was unable either to extinguish the fire on him or to pull him from the burning room.

Finally, in his charge, the judge emphasized the fact that before the jury could convict defendant of any crime encompassed by the indictment the State must have satisfied each juror beyond a reasonable doubt of every element of that crime, and—by the same token—the State must have negated beyond a reasonable doubt every defense upon which defendant had relied. He also charged as follows with reference to accident: "If Donnie Freeman died by accident or misadventure, that is, without wrongful purpose or criminal negligence on the part of the defendant, the defendant would not be guilty. The burden of proving accident is not on the defendant. Her assertion of accident is merely a denial that she had committed any crime. The burden remains on the State of North Carolina to prove defendant's guilt beyond a reasonable doubt."

From our examination of the record we conclude that defendant has received a fair trial, free from prejudicial error. Her conviction of second degree murder is therefore sustained.

No error.