STATE OF NORTH CAROLINA v. JOHN ROSWELL REYNOLDS, JR.

No. 5

(Filed 6 November 1979)

1. **Criminal Law §§ 23, 75.1, 76.10, 146.5 — confession—suppression motion properly denied**

Defendant was not denied his rights under *Dunaway v. New York*, 99 S.Ct. 2248, by the trial court's denial of his motion to suppress statements which he made to police officers, since (1) *Dunaway* dealt with the legality of custodial interrogation of an unwilling detainee on less than probable cause, while defendant in this case initiated contact with the police who, acting upon his phone call, investigated the crime scene and discovered links connecting defendant with the crime sufficient to establish probable cause for his arrest, though defendant was not "in custody" at the time of his confession; and (2) defendant effectively waived any rights he might have had under *Dunaway* by failing to notify either the state or the court during plea negotiations that he intended to appeal denial of his suppression motion.

2. **Criminal Law §§ 23, 76.10, 146.5 — suppression motion denied—notice of appeal required before plea bargain completed**

When a defendant intends to appeal from a suppression motion denial pursuant to G.S. 15A-979(b), he must give notice of his intention to the prosecutor

State v. Reynolds

and the court before plea negotiations are finalized or he will waive the appeal of right provisions of the statute.

**3. Arrest and Bail § 3.11; Constitutional Law § 51— taking defendant before magistrate without delay—no mandatory requirement**

Provisions of G.S. 15A-501 and G.S. 15A-511 requiring that an arrested person must be taken before a magistrate without unnecessary delay do not prescribe mandatory procedures affecting the validity of a trial.

**4. Arrest and Bail § 3.11; Constitutional Law § 51— warrantless arrest—taking defendant before magistrate—no unnecessary delay**

Defendant was taken before a judicial official "without unnecessary delay" where he was not under arrest prior to the time of his initial questioning; once questioning began around noon, defendant confessed his guilt within approximately 40 minutes; he was fully informed of his rights on two occasions within that 40 minutes and made an intelligent waiver of counsel; and as soon as the confession was recorded, defendant was taken to a magistrate sometime between 2:00 and 3:00 p.m. at which time he was formally charged.

**5. Criminal Law § 76.6— waiver of counsel at interrogation—sufficiency of finding**

There was no merit to defendant's contention that the trial court erred in failing to make adequate findings as to whether defendant requested counsel during the time of his interrogation, since the court clearly found that defendant waived his right to counsel, and the essential finding on a voir dire to determine suppression is not that defendant "did not request" counsel but that defendant waived counsel.

**6. Criminal Law § 84; Searches and Seizures § 4— taking of hair samples—consent—no illegal arrest**

Where there was no illegal arrest and defendant clearly consented to the taking of hair samples after officers explained that he was not required to do so, defendant could not complain on appeal that testimony of the results of an analysis of the hair samples should have been excluded at his sentencing hearing.

**7. Criminal Law § 138.4; Homicide § 31— three crimes charged—plea bargain—two life sentences given—issue of merger not before court**

Where defendant was charged with first degree murder, first degree rape and first degree burglary but received two consecutive life terms upon negotiated pleas of guilty to second degree murder, first degree rape and first degree burglary, the issue of merger was not before the court on appeal.

Justice BROCK took no part in the consideration or decision of this case.

Justice EXUM dissenting in part.

DEFENDANT was charged with first degree murder, first degree rape and first degree burglary of an 86-year-old woman. He received two consecutive life terms upon *negotiated pleas of*

*guilty* to second degree murder, first degree rape and first degree burglary. Sentence was imposed by *Judge Seay* at the 6 November 1978 Special Criminal Session of Superior Court, CASWELL County.

Prior to trial, defendant moved to suppress certain evidence and a confession he made to the police. At the suppression hearing before Judge Kivett at the 19 June 1978 Session of Caswell County Superior Court, the State presented several witnesses.

### EVIDENCE FOR THE STATE

Caswell County Deputy Sheriff O. A. Worsham testified that he was on duty as a radio dispatcher on 11 September 1977 when he received a call at 2:12 a.m. The caller stated that he was defendant, Johnny Reynolds, and said that he needed an officer. The caller said that he had been coming down the road by his house, thought he heard an elderly neighbor, Mrs. Lula Stephens Thompson, holler and had gone up to her house. He said it appeared to him that Mrs. Thompson was unconscious or dead in the house. Worsham told the caller to stay right there and the sheriff's office would send out an officer. Worsham testified that the caller talked intelligently and "plain," and gave directions to his location. A Deputy Gwynn, who apparently knew defendant as a friend, also spoke with him.

S.B.I. Agent S. A. Pennica testified that he arrived at the crime scene about 4:30 a.m. and noticed defendant asleep in the back seat of one of the patrol cars. Pennica had no discussion with defendant at that time and went on into the Thompson house to conduct his investigation which he concluded at approximately 10:40 a.m. that morning.

Agent Pennica's next opportunity to observe the defendant was at the Caswell County Sheriff's Office in Yanceyville at approximately 11:50 a.m. At that time he saw defendant in the holding cell of the jail. Soon after he arrived, Agent Pennica witnessed S.B.I. Agent Childrey advising defendant of his rights and saw defendant sign a waiver. Agent Childrey, Agent Pennica and the sheriff, who were all present, identified themselves to defendant as investigators of the crime. Defendant had not been told prior to questioning that he was a suspect in the case.

Agent Pennica testified that defendant appeared to be alert and awake during the initial questioning and acted concerned about what the investigation had shown. Defendant was dressed in blue jeans with no shirt or shoes on and had scratches and bruises on him. Pennica did not smell the odor of alcohol on defendant's breath and defendant did not appear to him to be overly upset, though "a little nervous." No offer was made to call an attorney for the defendant but later on an offer was made to call a family member.

Pennica advised the defendant that he was not required to give hair samples but requested permission to obtain them anyway. Defendant replied that this would be "fine," so Pennica took the samples. Pennica also asked if defendant would submit to having blood drawn and defendant consented. Before either the hair was taken or the blood drawn, defendant was told about the physical findings at the scene and told what use would be made of the samples.

No one told defendant that if he told the truth and cooperated that this would be disclosed in court or that it would help clear his conscience. After approximately 40 minutes, defendant made a taped statement after having been reminded of his rights for the second time.

Defendant was fingerprinted and photographed and his pants were taken after the interview was completed around 2:30 p.m. The blood sample was drawn at 3:00 p.m.

State's third witness, S.B.I. Agent Thomas C. Childrey, testified that he was in charge of the investigation and first spoke to the defendant at 11:58 a.m. in the sheriff's office. At that time he advised defendant of his constitutional rights. Defendant signed a statement indicating that he understood his rights and that he did not want a lawyer. Defendant was again advised of his rights at 12:40 p.m. Defendant indicated again that he understood his rights and that his original waiver was still in effect. No promise of leniency was made to defendant. At 11:58 a.m., when defendant was first advised of his rights, he was told that he was suspected of murder and later in the interview was told that it would be possible that the charges against him would be first degree murder, first degree burglary and rape. Agent Childrey did not take defendant to a magistrate before questioning him.

### EVIDENCE FOR THE DEFENDANT

Defendant testified on his own behalf that he was 25 years old, was involved in logging work and lived with his stepmother. He said he drank heavily during the week leading up to 11 September 1977 and did not recall making a phone call to the sheriff's office but had been told that he had done so. He did recall seeing Deputies Graves and Gwynn the morning after the crime. The officers came to his home on that date and took him to Mrs. Thompson's house. Once there he got out of the car and started toward the dwelling, but one of the officers told him not to come to the house. He was asked to get back into the car and did so. He assumes he then went to sleep and did not get up until the next morning, after daylight. He asked what he was doing there and did not get an answer, "but I didn't go anywhere because I was under the impression that I could not go anywhere." When he woke up, one of the officers was standing up against the front of the car. No one said anything to him while he was in the car and he felt miserable when he woke up from the heavy drinking. No one said that he was under arrest and he does not recall asking if he could leave. After they left the Thompson house and started to Yanceyville, he asked Officer Gwynn if he would stop at a store so that he could get milk and cigarettes. Officer Gwynn did so, and defendant entered the store unaccompanied to make his purchases.

After defendant arrived at the sheriff's office around 10:00 a.m. one of the officers told him that he could sit in the holding cell because there was a bench or stool there that would be comfortable. Defendant went in and sat down and someone closed the door and he said they locked it. They later brought him a mattress and a sheet.

When taken into the sheriff's office, defendant said he was not told that he was a suspect in the case, but he was told he had a right to a lawyer. He was shown a piece of paper and signed it. He was told that he had made a phone call to the sheriff's department that night and was told what he had said during the call. He was shown a shirt, and was asked if it was his. He was told the shirt was found at the crime scene. He recalls police asking for his hair and blood samples but does not recall his response. He recalls mentioning "something about having an attorney present"

but said he was told that he had signed a waiver with respect to a lawyer. He said he was led to believe that police would be easier on him if he cooperated. He was not taken before a magistrate until around 2:30 or 3:00 p.m. and was never told that he had the right to communicate with family or friends. The magistrate did not indicate that he had a right to communicate with counsel. He did not realize what he was being charged with until he received copies of the warrants. He first saw a lawyer the following day.

Several other witnesses testified that defendant had been drinking heavily up until around midnight on the evening in question and had engaged in a fight. A psychiatrist testified about defendant's mental condition.

Defendant also called Deputy Sheriff Graves who testified that at about 3:30 a.m. he and Deputy Gwynn were directed by the sheriff to go to the home of defendant, about a mile and a half from the crime scene, and pick him up. Defendant was in the house and came to the door when the deputies blew their horn. The defendant got into the unlocked back seat and they all went to the Thompson house. The deputies did not ask defendant any questions, but immediately upon entering the car, he spontaneously started speaking. He told them he had heard a noise from Mrs. Thompson's house while passing by and went to see what had happened. Her door was locked so he pulled a screen off, went in a window and saw someone lying on the floor. He said he came out, ran the mile and a half home, and called because he did not want anyone to think he had done something wrong.

After this volunteered comment, deputies and defendant arrived at the Thompson house. The deputies got out of the car and the defendant lay down and went to sleep in the back seat. During the night, the deputies were out in the yard at different places and at times were in the house, but Deputy Graves specifically stated that "nobody was definitely watching and assigned to keep an eye on [defendant]." After finishing their work at the crime scene, deputies were instructed to bring defendant back to Yanceyville, get him something to eat and "put him up" until the sheriff and the S.B.I. arrived. "As to whether he was free to walk home at the time we left the scene . . . [n]obody said nothing about him walking home." In Yanceyville defendant was not taken to a regular lockup but was shown to a holding cell.

Defendant was not arrested at the time he was with Deputy Graves. Deputy Graves did not suspect defendant, nor had the sheriff said anything about defendant being a suspect. Defendant was simply considered the only source of information about the crime since he had reported discovering the victim's body.

Graves further testified that after arriving at the Thompson home, no one said anything to the defendant about restricting his movements in any way. The car was never locked. Defendant asked if it would be alright to go to sleep and was told that it was. Defendant complained that it was cold so the deputies rolled up the windows and he went to sleep.

Explaining the stop for cigarettes at the convenience store, Graves said no one attempted to restrict defendant's movements in any way. Defendant was not asked questions by anyone during the time he was in the car at the Thompson house or while en route to Yanceyville. As they were driving toward Yanceyville, defendant asked if they thought he had done it and was told only that "the sheriff might want to talk with him later as he was the only man that saw it."

At the sentencing hearing, the testimony of S.B.I. Agent Childrey revealed that the defendant made, *inter alia*, the following disclosures to the officers at his interview which was transcribed from the tape recording: That he went in Mrs. Thompson's house and started "messing" with her; that she tried to hit him with a flashlight and he took it away from her and wrestled with her; that he didn't know when she was dead but it scared him and he ran home and called the sheriff's department; that he thinks he had intercourse with her and that she was alive at the time; that he might have choked her; that too much drinking caused him to do this.

### TRIAL COURT ORDER

Judge Kivett, in a lengthy and detailed order denying the motion to suppress, found and concluded, *inter alia*, as follows: (enumeration ours)

(1) That the sheriff and other investigators considered defendant the only source of information available to them in connection with the investigation and defendant was transported to

the Thompson home for the purpose of being available to provide further information.

(2) Defendant made a voluntary statement but he was not considered a suspect at the time by the deputies and had been picked up only at the request of the sheriff so that he might possibly provide additional information.

(3) That while in the sheriff's car at the Thompson home for several hours, his movements were not restricted and he was not suspected at that time because the investigation had not progressed far enough; that he slept in the back of the sheriff's car from approximately 3:30 a.m. until approximately 9:00 a.m. the next morning. At approximately 10:00 a.m., he was transported to the sheriff's office "to make him available for providing additional information to the sheriff if the need should arise."

(4) That no promises were made to defendant to induce him to waive his right to have an attorney; that he was not coerced in any way and that he did freely, voluntarily and understandingly answer questions of an incriminating nature to the officer conducting the interview.

(5) That, after he made the first statement which the State proposed to offer at trial, following the advisement of his constitutional rights and his waiver to have a lawyer present and his waiver to remain silent at approximately 11:58 a.m., the investigating officer reiterated certain rights and defendant reiterated that he understood them and did not want an attorney present and that he consented to a tape recording being thereafter made of any answers he might give in the interrogation.

(6) That defendant was clearly in control of his faculties at the time and understood the nature of the inquiry being made and of his rights under the law.

(7) That he freely and voluntarily and understandingly waived his right to have an attorney present and waived the right to remain silent and other rights under the law and that he freely and voluntarily gave his statement to the interrogating officer.

(8) That none of defendant's rights under Chapter 15A of the General Statutes were violated and that specifically with respect to G.S. 15A-511 and G.S. 15A-501, defendant made no showing that he was not taken before a magistrate "without unnecessary delay."

(9) That defendant was not placed under arrest until sometime later during the morning of 11 September 1977 and that until the time that the sheriff and the two S.B.I. agents began their interview, defendant was free to leave the dispatcher's room and the sheriff's office at the Caswell County Jail.

(10) That even if the arrest had actually occurred at an earlier time, it was necessary for the officers to proceed further with the investigation before they had an opportunity to return to the sheriff's office to make further inquiries of the defendant.

(11) That none of defendant's rights under either federal or state constitutions were violated.

(12) That defendant's statements were freely and voluntarily made and defendant was told by the officers that they were asking for samples of hair from his person and blood from his body so that comparison tests might be made and that he knowingly and intelligently and voluntarily decided to cooperate with the officers and to voluntarily give samples or permit them to be taken for the purposes stated by the officer.

The trial court then denied defendant's motion to suppress the statements and the samples taken.

Judge Kivett's order is dated 22 June 1978. Thereafter, on 7 November 1978, Judge Seay conducted a sentencing hearing at which time much of the evidence summarized above was again introduced. Defendant entered a negotiated plea of guilty and sentence was imposed as hereinabove indicated. Immediately after the sentence was entered, defendant gave notice of appeal with respect to the denial of his motion to suppress and moved for the court to provide a transcript of the suppression hearing, a transcript of his sentencing hearing and moved for appointment of counsel to prepare the notice of appeal. Judge Seay held that the pleas of guilty entered for defendant were negotiated pleas, that defendant stated in open court that the negotiated plea set

forth in his transcript of plea contained the entire plea arrangement and that defendant had accepted the arrangement with no mention to the court concerning an appeal. Judge Seay concluded that by entry of the negotiated pleas, the defendant waived any right of appeal that he might have had in regard to the motion to suppress in these cases. He therefore denied defendant's motions.

Defendant thereafter petitioned this Court for certiorari which was allowed on 6 February 1979 on the basis of G.S. 15A-979(b) which provides: "An order finally denying a motion to suppress evidence may be reviewed upon an appeal from a judgment of conviction, *including a judgment entered upon a plea of guilty.*" (Emphasis added.)

Our consideration, therefore, is whether Judge Kivett properly denied defendant's motion to suppress.

*Attorney General Rufus L. Edmisten by Associate Attorney Grayson G. Kelley for the State appellee.*

*Melzer A. Morgan, Jr. for defendant appellant.*

CARLTON, Justice.

On appeal, defendant presents five contentions for our review: (1) That his rights were denied under principles established by the United States Supreme Court in *Dunaway v. New York*, 99 S.Ct. 2248 (1979); (2) that his right to be taken promptly to a magistrate was denied, violating principles established by the United States Supreme Court in *McNabb v. United States*, 318 U.S. 322, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed. 2d 1479 (1957), and by our own legislature in G.S. 15A-501 and G.S. 15A-511; (3) that the trial court did not properly find that defendant had freely and voluntarily waived his right to counsel; (4) that the trial court erred in finding that defendant freely and voluntarily consented to the taking of hair samples, and (5) that the three offenses charged merged and only one life term would be the appropriate sentence.

We reject defendant's contentions and affirm the trial court. We discuss the contentions in order.

## I. THE CONTENTION UNDER *DUNAWAY v. NEW YORK*

In *Dunaway, supra,* the proprietor of a pizza parlor in Rochester, New York was killed during an attempted robbery. A Rochester detective was told by another officer that a jailed informant had supplied a possible lead implicating the defendant. The detective questioned the jail inmate but learned nothing sufficient to get a warrant for defendant's arrest. Nevertheless, he ordered other detectives to "pick up" defendant and "bring him in." Three detectives located defendant and he was taken under custody but was not told he was under arrest. Police testified, however, he would have been physically restrained if he had attempted to leave. He was driven to police headquarters in a police car and placed in an interrogation room where he was questioned by officers after having been given his *Miranda* warnings. He waived counsel and eventually made statements and drew sketches that incriminated him in the crime. At trial, defendant moved to suppress the statements and sketches and the motion was denied. Defendant was convicted as charged. The United States Supreme Court granted certiorari "to clarify the Fourth Amendment's requirements as to the permissible grounds for custodial interrogation. . . ." 99 S.Ct. at 2253, in a situation when there is less than probable cause for a full-fledged arrest.

That Court then held that police officers violated defendant's fourth and fourteenth amendment rights.

The Court first noted that defendant was "seized" in the fourth amendment sense when he was taken *involuntarily* to the police station. The State had readily conceded that the police lacked probable cause to arrest defendant before his incriminating statement during interrogation. The Court rejected the State's argument that the seizure of defendant did not amount to an arrest and was permissible under the fourth amendment because the police had a "reasonable suspicion" that defendant possessed "intimate knowledge about a serious and unsolved crime." 99 S.Ct. at 2254. The Court noted that detention of defendant was in important respects indistinguishable from a traditional arrest. Defendant was not questioned briefly where he was found, but was taken from a neighbor's home in a police car, transported to a police station, and placed in an interrogation room. The Court noted that defendant was never informed that

he was free to leave and, in fact, police testified that he would have been physically restrained if he had attempted to leave. The Court emphasized the central importance and historical guarantee of the fourth amendment's probable cause requirement and refused to adopt the New York Court's balancing test of "reasonable police conduct under the circumstances" to cover all seizures that do not amount to technical arrests. The Court concluded that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." 99 S.Ct. at 2258.

The Court then addressed the question whether the connection between the unconstitutional police conduct and the incriminating statements and sketches obtained during the illegal detention was nevertheless attenuated to permit the use at trial of the statements and sketches. The Court held, citing *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed. 2d 416 (1975), that although a confession after proper *Miranda* warnings may be found to be "voluntary" for purposes of the fifth amendment, this type of "voluntariness" is merely a "threshhold requirement" for fourth amendment analysis. The Court stated:

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be sustantially diluted. . . . Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings.

99 S.Ct. at 2258-59, citing *Brown v. Illinois, supra* at 602, 95 S.Ct. at 2261, 45 L.Ed. 2d at 426.

[1] While this decision by our United States Supreme Court clearly has major ramifications with respect to the question of the legality of custodial questioning on less than probable cause, we do not believe that it controls the case at bar. First, this case is significantly distinguishable on the facts and, second, defendant effectively waived any rights he might have had under *Dunaway*

by failing to notify either the State or the court during plea negotiations that he intended to appeal denial of his suppression motion.

*Dunaway* and the case at bar differ significantly in the following respects:

(1) In *Dunaway*, three detectives went to get the defendant on the basis of a tip. The Court specifically stated that defendant *involuntarily* went with the police. Here, defendant initiated the contact with the sheriff's office by calling the dispatcher on the telephone. This defendant *voluntarily* accompanied the deputies.

(2) In *Dunaway*, the evidence clearly established that defendant would not have been allowed to leave had he attempted to do so. Here, there is no evidence that defendant would not have been allowed to leave. Moreover, Judge Kivett found as a fact at the suppression hearing that defendant, during the period prior to his arrest, was free to leave the dispatcher's room and the sheriff's office at the Caswell County Jail. There is sufficient evidence in the record to support the trial court's finding and we are bound by it on this appeal. *State v. Freeman*, 295 N.C. 210, 221, 244 S.E. 2d 680, 686 (1978); *State v. Jones*, 293 N.C. 413, 424, 238 S.E. 2d 482, 489 (1977); *State v. Thompson*, 287 N.C. 303, 317, 214 S.E. 2d 742, 751 (1975), *death sentence vacated*, 428 U.S. 908, 96 S.Ct. 3215, 49 L.Ed. 2d 1213 (1976).

(3) In *Dunaway*, the Court found that the detention of defendant was indistinguishable from a traditional arrest because petitioner was not questioned briefly where he was found but was instead taken from a neighbor's home to a police car and transported directly to an interrogation room. Here, however, petitioner volunteered his availability, and was obtained from his home because he had called in information to the sheriff. He was taken by car to the yard of the crime scene to be available to provide further information to the sheriff but arrived in the midst of a busy investigation and promptly made himself unavailable for coherent questioning by falling asleep.

(4) In *Dunaway*, there is some evidence of physical coercion by the police at the time of the pickup. *See People v. Dunaway*, 61 App. Div. 2d 299, 305-06, 402 N.Y.S. 2d 490, 495 (1978) (Cardamone, J., dissenting). Here, there is no evidence of any physical coercion by the police at any time.

State v. Reynolds

(5) In Dunaway, the Court, citing Brown, supra, identified several factors to be considered "in determining whether the confession is obtained by exploitation of an illegal arrest": (a) The temporal proximity of the arrest and the confession (less than two hours elapsed between the arrest and the confession), (b) the presence of intervening circumstances (the Court found none), and (c) the purpose and flagrancy of the official misconduct (the arrest without probable cause had a "quality of purposefulness" in that it was an "expedition for evidence" admittedly undertaken "in the hope that something might turn up"). 99 S.Ct. at 2259, citing Brown v. Illinois, supra at 603-05, 95 S.Ct. at 2261-62, 45 L.Ed. 2d at 427-28. Here, (a) over ten hours elapsed between the time defendant left his home with the deputies and the confession, (b) there was a significant "intervening event" of defendant sleeping from 3:30 a.m. until 9:00 a.m. at his own request as well as ample evidence defendant could have left at any time including the stop at the convenience store, and (c) there certainly was no evil purpose or "expedition for evidence" on the part of the deputies in originally going for the defendant for defendant himself had called to offer information about the crime and to volunteer his help. Indeed he was so eager to help that he didn't even wait for police to come to his door but came out when they sounded the car horn.

In summary, we do not think that the principles regarding detention for custodial interrogation promulgated by Dunaway contemplate the factual situation disclosed by the record before us. Certainly these facts do not "trigger the traditional safeguards against illegal arrest." Defendant here originally confronted police on his own volition for the purpose of providing additional information. He then elected to sleep several hours in the police car in which there is no evidence to indicate that he was restrained. Before being questioned, the police had developed adequate probable cause to suspect defendant of the crimes from the result of their investigation and defendant was accorded all of his constitutional rights.

With respect to the claim under Dunaway, we add this final note. As indicated supra, since there is evidence to support it, we are bound by the trial court's finding that the defendant was not under arrest until he was advised of his rights and questioning commenced. We would simply note that there was also sufficient evidence to have supported a trial court finding that defendant

was restrained beginning at approximately 10:00 a.m. when he and the deputies left the crime scene by car and started toward Yanceyville. Even under that finding, however, defendant's reliance on *Dunaway* would be misplaced because at that time sufficient probable cause existed to detain defendant.

The record reveals that by the time the investigation was nearly completed (sometime just prior to 10:00 a.m.) the police had established the following links between defendant and the crime:

(1) Bare footprints were found in and about the house and defendant was wearing no shoes at the time he came to the scene.

(2) A T-shirt, blood stained, was found in the house and defendant was shirtless.

(3) There was evidence of a vigorous struggle and defendant was scratched about his face and torso.

(4) The only unsecured entrance to the house police found was the window defendant had said he used to break into the house. All other exits were still locked.

Based on such a series of facts " 'the facts and circumstances within their [the officers'] knowledge, and of which they had reasonably trustworthy information, [were] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense [had] been . . . committed" by the defendant. *Brinegar v. U.S.*, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949) quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 2d 543, 555 (1925).

Moreover, assuming *arguendo* that the facts of this case are embraced by the holding in *Dunaway*, we believe that defendant effectively waived any fourth amendment rights by failing to give notice of appeal during his negotiated plea of guilty.

The rule is well established that a guilty plea, intelligently and voluntarily made with the aid of counsel, bars the latter assertion of constitutional challenges to the plea negotiation proceeding. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed. 2d 747 (1970); *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed. 2d 763 (1970); *Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed. 2d 785 (1970).

This rule was reiterated by the United States Supreme Court in *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed. 2d 235 (1973). There, the Court said:

> When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

*Id.* at 267, 93 S.Ct. at 1608, 36 L.Ed. 2d at 243.

The Court characterized the guilty plea as "a break in the chain of events which has preceded it in the criminal process." Therefore, a person complaining of such "antecedent constitutional violations" is limited in a federal habeas corpus proceeding to attacks on the voluntary and intelligent nature of the guilty plea, through proof that the advice received from counsel was not "within the range of competence demanded of attorneys in criminal cases."

More recently, in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed. 2d 628 (1974), the Court held that the principles established by the *Brady* trilogy and *Tollett* are not applicable to preclude a defendant's appeal when the constitutional claim relied upon by defendant goes to the very power of the state to bring the defendant into court to answer the charge brought against him. In *Blackledge*, the State had improper jurisdiction over the defendant because it denied him due process of law when it brought a felony charge against him in a North Carolina superior court after his appeal from a misdemeanor conviction for the same conduct. *Blackledge* was distinguished from the *Brady* trilogy and *Tollett* on the ground that the constitutional claims presented by the former went to the ability of the State to bring the defendant into court to answer the charge brought against him. *Accord, Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed. 2d 195 (1975) (per curiam).

Here, another dimension is added to the general rule because our legislature has decided to permit a defendant to appeal from an adverse ruling in a pretrial suppression hearing despite the fact that defendant's conviction is based on a guilty plea. G.S. 15A-979(b) provides: "An order finally denying a motion to sup-

press evidence may be reviewed upon an appeal from a judgment of conviction, including a judgment entered upon a plea of guilty."

Several states, most notably New York, California and Wisconsin, have similar statutes. *See* Cal. Penal Code § 1538.5(m) (West Supp. 1978); N.Y. Crim. Proc. Law § 710.70(2) (McKinney 1977); Wisc. Stat. Ann. § 971.31(10) (West 1971).

The reasons given for the adoption of such laws vary. In some courts it is said that allowing an appeal from a guilty plea by statute where defendant has only a single constitutional challenge reduces the unnecessary waste of time involved when a defendant proceeds to trial to preserve the issue. *See People v. Paris*, 48 Cal. App. 3d 766, 122 Cal. Rptr. 272 (1975). Other courts assert that such statutes provide a speedy remedy for a defendant in a readily accessible court. *See People v. Enos*, 34 Cal. App. 3d 25, 109 Cal. Rptr. 876 (1973). Indeed, the idea has become a model standard of both the American Bar Association, and the National Conference on Uniform Rules of Criminal Procedure. *See* A.B.A. Project on Minimum Standards for Criminal Standards, Standards Relating to Criminal Appeals 31-32 (Approved Draft 1970), and the National Conference on Uniform Rules of Criminal Procedure, Rule 444(d). However, at least one New York court has found the practice burdensome. *See People v. Navarro*, 61 App. Div. 2d 534, 403 N.Y.S. 2d 80 (1978).

The United States Supreme Court has also dealt with this issue. In *Lefkowitz v. Newsome*, 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed. 2d 196 (1975), the Court held that when a state law permits a defendant to plead guilty without forfeiting his right to judicial review of specified constitutional issues, the defendant is not foreclosed from pursuing those constitutional claims in a federal habeas corpus proceeding. The narrow holding in *Lefkowitz*, however, was made on the basis that "[t]he plea [was] entered with the clear understanding and expectation by the State, the defendant, and the courts that it will not foreclose judicial review of the merits of the alleged constitutional violations." *Id.* at 290, 95 S.Ct. at 890, 43 L.Ed. 2d at 202. In *Lefkowitz*, the Court emphasized that Newsome had indicated his intention to appeal both his conviction and the denial of his motion to suppress at the time of his sentencing proceeding. Such a clear understanding and expectation are lacking in the case *sub judice*. There is absolutely

no evidence in the record that the State or the Court were aware at the sentencing hearing that defendant intended to appeal the denial of his suppression motion. Indeed, the sentencing hearing was before a different judge some three months after the suppression motion hearing and Judge Seay's order indicates that he did not anticipate such an appeal. We do not believe that our statute, nor the holding in *Lefkowitz*, contemplates a factual pattern such as that disclosed here—one which would cause the State to be trapped into agreeing to a plea bargain in a case as gruesome as this and then have the defendant contest that bargain.

As stated by the United States Supreme Court, "Once the defendant chooses to bypass the orderly procedure for litigating his constitutional claims in order to take the benefits, if any, of a plea of guilty, the State acquires a legitimate expectation of finality in the conviction thereby obtained." *Lefkowitz v. Newsome, supra* at 289, 95 S.Ct. at 889, 43 L.Ed. 2d at 202.

[2]   The plea bargaining table does not encircle a high stakes poker game. It is the nearest thing to arm's length bargaining the criminal justice system confronts. As such, it is entirely inappropriate for either side to keep secret any attempt to appeal the conviction. We therefore hold that, when a defendant intends to appeal from a suppression motion denial pursuant to G.S. 15A-979(b), he must give notice of his intention to the prosecutor and the court before plea negotiations are finalized or he will waive the appeal of right provisions of the statute. We cannot believe that our legislature, in adopting G.S. 15A-979(b), intended any less fair posture for appeal from a guilty plea.

II. CLAIM OF RIGHT TO BE TAKEN BEFORE A MAGISTRATE

Defendant next contends that the trial court committed error in failing to grant his motion to suppress by virtue of that portion of G.S. 15A-974(2) which requires that evidence must be suppressed if "[i]t is obtained as a result of a *substantial violation* of the provisions of this Chapter." (Emphasis added.) He contends that there was a "substantial violation" of certain requirements of G.S. 15A-501 and G.S. 15A-511.

G.S. 15A-501(2), upon which defendant relies, provides that upon the arrest of a person, a law enforcement officer "[m]ust . . .

take the person arrested before a judicial official without unnecessary delay."

G.S. 15A-511 provides in pertinent part as follows:

(a) Appearance before Magistrate.—

> (1) A law-enforcement officer making an arrest with or without a warrant must take the arrested person without unnecessary delay before a magistrate as provided in G.S. 15A-501.

. . . .

(b) Statement by the Magistrate.—The magistrate must inform the defendant of:

> (1) The charges against him;
>
> (2) His right to communicate with counsel and friends;
>     . . .

. . . .

(c) Procedure When Arrest Is without Warrant; Magistrate's Order.—If the person has been arrested, for a crime, without a warrant:

> (1) The magistrate must determine whether there is probable cause to believe that a crime has been committed and that the person arrested committed it, . . .

Defendant's essential contention here is that both the letter and spirit of these statutes illustrates the legislative intent that the right of counsel can, and should, be more effectively explained by a judicial officer. He further contends that failure to comply with these statutes was prejudicial to him because, during the two-hour period of questioning by the law enforcement officers, he gave hair samples and an incriminating confession.

[3] Unquestionably, the failure of law enforcement personnel in complying with the provisions of these statutes can result in the violation of a person's constitutional rights. We reaffirm, however, our holding under the predecessor statutes to G.S. 15A-501 and G.S. 15A-511 that these statutes do not prescribe mandatory procedures affecting the validity of a trial. *State v.*

*McCloud*, 276 N.C. 518, 531, 173 S.E. 2d 753, 763 (1970); *see also State v. Curmon*, 295 N.C. 453, 457, 245 S.E. 2d 503, 505 (1978); *State v. Burgess*, 33 N.C. App. 76, 234 S.E. 2d 40 (1977).

[4] Here, we perceive no prejudice against defendant on the basis of the record before us. As we have indicated, *supra*, defendant was not under arrest prior to the time of his initial questioning. Once questioning began around noon, defendant confessed his guilt within approximately 40 minutes. He was fully informed of his rights on two occasions within that 40 minutes and made an intelligent waiver of counsel. As soon as the confession was recorded, defendant was taken to a magistrate sometime between 2:00 p.m. and 3:00 p.m. at which time he was formally charged. We find that defendant was taken before a judicial official "without unnecessary delay."

Defendant also contends that failure of law enforcement personnel to take him before a magistrate sooner violates the decisions of our United States Supreme Court in *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed. 2d 1479 (1957). Defendant's reliance on these decisions is misplaced. In both those cases, confessions were suppressed by virtue of Rule 5(a) of the Federal Rules of Criminal Procedure. Those rules, of course, apply only to the federal courts and the holdings in *McNabb* and *Mallory* have expressly not been applied by state courts. *See* 29 Am. Jur. 2d, Evidence § 547 at 600 (1967 & Cum. Supp. 1979) and cases cited therein. The validity of this approach is bolstered by decisions of the United States Supreme Court to the effect that the McNabb-Mallory Rule is not binding on state courts, and holding that a confession is not inadmissible merely because of an undue delay on the part of police in taking defendant to the magistrate prior to his confession. *See Crooker v. California*, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed. 2d 1448 (1958); *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), *ovrld. on other grounds, Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963); *Gallegos v. Nebraska*, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951). We would further note that the holdings established by the decisions of the United States Supreme Court in *McNabb* and *Mallory* were greatly modified for federal courts by Title II of the Omnibus Crime Control and Safe

Streets Act of 1968, 18 U.S.C. § 3501. This assignment of error is overruled.

### III. CLAIM OF INADEQUATE FINDINGS BY TRIAL COURT

[5] Defendant next contends that the trial court erred in failing to make adequate findings as to whether defendant requested counsel during the time of his interrogation. He argues that there is some conflict in the testimony presented at the suppression hearing which was not addressed or resolved by the trial court's order. Defendant relies on the decision of this Court in *State v. Fox*, 274 N.C. 277, 163 S.E. 2d 492 (1968) and *State v. Waddell*, 34 N.C. App. 188, 237 S.E. 2d 558 (1977).

Defendant's reliance on these decisions is also misplaced. In both those cases, the evidence was sharply conflicting as to whether the defendant had requested an attorney prior to the time of making his confession. And in both cases, the trial court made *no* mention of counsel whatsoever in its findings of fact. Such omission was sufficient to remand each case for a new trial.

Here, however, the trial court did mention a request for counsel. While its order does not expressly find that defendant "did not request" counsel during the time of his interrogation, the court clearly found, in several instances, that defendant *waived* his right to counsel.

Indeed, under our decisions in *State v. Siler*, 292 N.C. 543, 549-50, 234 S.E. 2d 733, 737 (1977) and *State v. Biggs*, 289 N.C. 522, 531, 223 S.E. 2d 371, 377 (1976), the essential finding at *voir dire* is not that defendant "did not request" counsel but that defendant waived counsel. Here that essential finding was made.

We do not believe that *Fox, supra*, or *Waddell, supra*, requires the use of any particular phrasing to express the trial court's clear and unmistakable finding that defendant did not request counsel but in fact waived it. This assignment of error is therefore overruled.

### IV. CLAIM OF VIOLATION OF FOURTH AMENDMENT RIGHTS
### IN TAKING OF HAIR SAMPLES

[6] Defendant next assigns as error the admission into evidence at the sentencing hearing of testimony of the results of an

analysis of hair samples taken from his body. F.B.I. laboratory specialist Neil testified that "[b]ased upon my experience in the last 15 years, this is one of the few cases in which I was able to work with this many questioned hairs, all of which fell within the range of comparison characteristics exhibited in the samples." He added, "The hairs either originated from the person represented by the known sample, purportedly from the defendant, or from some other individual of the white race exhibiting the same range of microscopic characteristics and the latter possibility I consider as remote." The record discloses that, during the interrogation in the sheriff's office, the officers requested, and defendant consented to, the taking of head and pubic hairs from the defendant.

We have previously dealt with this issue in *State v. Sharpe*, 284 N.C. 157, 200 S.E. 2d 44 (1973). We held there, and reaffirm here, that an official in-custody investigative technique designed to uncover incriminating evidence from a person's body is such a minor intrusion into or upon the individual's person that it is not an unreasonable seizure. In *Grimes v. United States*, 405 F. 2d 477 (5th Cir. 1968), it was said that "the obtaining of hair samples after lawful arrest, where the means employed are reasonable, is not a violation of [one's] constitutional right." *Id.* at 479. *See also United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed. 2d 67 (1973) (voice exemplars); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed. 2d 908 (1966); *United States v. D'Amico*, 408 F. 2d 331 (2d Cir. 1969).

We also note our prior holding that the provisions of the Criminal Procedure Act, G.S. 15A, Art. 14, relating to nontestimonial identification orders were not aimed at defendants in the custody of police officers. *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). There, as here, defendant was clearly in custody at the time of the police acts about which defendant complains. Indeed, defendant concedes, "had there been no illegality in detaining [him] without bringing him before a magistrate, no question of consent could be legitimately raised." Brief for Defendant at 30. We have held in an earlier portion of this decision that there was no illegal arrest. Moreover, the record discloses the defendant clearly consented to the taking of the hair sample after the officers explained that he was not required to do so. Hence, this assignment of error is overruled.

## V. Claim of Merger of Offenses

[7] Finally, defendant requests that we pass upon the question whether charges against him should merge. He argues that the killing was an unpremeditated "aberration" committed in the course of a rape. He notes that under cases such as *State v. Boyd*, 287 N.C. 131, 214 S.E. 2d 14 (1975), had the State proceeded under the felony murder rule, at least two of the charges would have merged.

We are not inclined to discuss extensively the various combinations of guilt and the consequences thereof which *might* have resulted had the State proceeded to trial on the original indictments. Clearly, the merger doctrine, which is well established in North Carolina, would have arisen had a jury found defendant guilty of felony murder. *State v. Squire*, 292 N.C. 494, 234 S.E. 2d 563, *cert. denied sub nom.*, *Brown v. N.C.*, 434 U.S. 998, 98 S.Ct. 638, 54 L.Ed. 2d 493 (1977); *State v. Williams*, 284 N.C. 67, 199 S.E. 2d 409 (1973); *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). Here, however, the issue of merger is not before us. This is so because defendant entered into a negotiated plea of guilty to second degree murder, first degree rape and first degree burglary in specific exchange for a sentence of two consecutive life terms. Defendant has in no way, on this appeal, attacked the validity of the terms of his plea bargain and we find no impropriety with respect to it.

We further note that while, as stated above, we granted certiorari on the basis of G.S. 15A-979(b), we also treated the petition as one to bypass the Court of Appeals. G.S. 7A-27(a) provides that there is no appeal of right to this Court when a sentence is based on a plea of guilty even when that sentence is life imprisonment. The proper court to hear this appeal, if motion to bypass is not made and granted, is the Court of Appeals.

We have carefully examined all of defendant's assignments of error and find them devoid of merit.

We find no error in either defendant's suppression or sentencing hearing.

No error.

Justice BROCK took no part in the consideration or decision of this case.

Justice EXUM dissenting in part.

The majority opinion has tried mightily to distinguish this case from *Dunaway v. New York*, 99 S.Ct. 2248, 60 L.Ed. 2d 824 (1979), decided after the trial proceedings in the instant case had occurred and while it was on direct appeal.[1] I believe the attempt is unsuccessful and that *Dunaway* is not distinguishable from the case before us. I respectfully dissent from that portion of the opinion dealing with the *Dunaway* issue.

The majority argues defendant was not in custody of the sheriff at the time he made his confession and, even if he was, the sheriff had probable cause to arrest him prior to that time. The state concedes that defendant was in custody and there was no probable cause to arrest him before he made his confession. We, of course, are not necessarily bound by these concessions; but, in the context of a fully adversarial proceeding as this is, they are entitled to some weight.

The majority says defendant was not in custody because (1) he voluntarily accompanied the deputy sheriffs when they were sent "to pick him up"; (2) no law officer testified that defendant would not have been allowed to leave had he attempted to do so; (3) defendant himself initiated the contact with the sheriff's office; and (4) Judge Kivett found that defendant was free to leave the sheriff's office "*up until the time that Sheriff Poteat and the two SBI agents . . . began their interview.*" (Emphasis supplied.)

That defendant voluntarily accompanied the deputies and initiated contact with the sheriff's office in no way detracts from the crucial fact that he was taken into custody by the deputies at the direction of the sheriff for questioning. Judge Kivett found as a fact that defendant "had been picked up by [the deputies] . . . at the request of the sheriff so that they might possibly secure additional information from him" and that "he was not considered a suspect at the time." That no law officer testified defendant

---

1. The majority assumes that *Dunaway* is sufficiently retroactive to apply to this case. An argument could be mounted that it is not. *Johnson v. New Jersey*, 384 U.S. 719 (1966) (held, *Miranda v. Arizona*, 384 U.S. 436 (1966) applicable only to trials begun after the date of its decision); *see also Jenkins v. Delaware*, 395 U.S. 213 (1969). The argument would probably fail, however, because of *Linkletter v. Walker*, 381 U.S. 618 (1965) (held, *Mapp v. Ohio*, 367 U.S. 643 (1961) applies to cases in which appeals were not final on date of decision.)

would not have been allowed to leave had he attempted to do so is immaterial. Neither did any officer testify that defendant would have been allowed to leave. Such testimony would at most have been the witness' opinion of the circumstances. As this Court decided today in *State v. Perry*, 298 N.C. 502, 259 S.E. 2d 496 (1979), determination of whether a suspect is in custody is made objectively by focusing on the actions of law officers. It is not based on whether defendant subjectively believed himself to be detained against his will or whether any particular officer might have so opined.

There can be no doubt that defendant here was taken into custody by the sheriff for the purpose of questioning and remained in such custody until he made his incriminating statements. Even if he had been somehow free to leave prior to the time the questioning began (and I find nothing in the record which supports this conclusion), Judge Kivett's findings establish by clear implication that at the time questioning itself began defendant would not have been free to leave. If, consequently, at that point there was no probable cause to detain defendant, his subsequent incriminating statements are rendered inadmissible by *Dunaway*.

I disagree also with the majority's alternative conclusion that the sheriff had probable cause to arrest defendant prior to the time interrogation began. The facts relied on by the majority to link defendant to the crime are consistent merely with defendant's initial admissions that he visited the crime scene and entered the victim's residence by breaking in a window. They are, in themselves, insufficient to constitute probable cause that defendant himself committed the crimes. After the investigation at the victim's residence had been completed and defendant was being taken by deputies to the sheriff's office, Judge Kivett found that defendant asked the deputies whether they suspected him. They replied, "No, they did not suspect him but they guessed that the sheriff might want to talk to him." Again the state concedes the absence of probable cause prior to defendant's making his incriminating statements.

I fully agree with the remainder of the majority opinion including its conclusion that defendant waived his Fourth Amendment rights by entering a negotiated guilty plea without notice

that he was pleading guilty conditionally under G.S. 15A-979(b). The legislature did not intend a defendant to have it both ways. The state is entitled to rely on a negotiated plea, nothing else appearing, as being a full and final settlement of the entire matter. The sentencing judge should know whether defendant's plea will finally dispose of the matter or whether there is the immediate prospect of a new proceeding and a new sentence. Where a defendant negotiates a plea with the state and enters it without notice to the state or the court that he intends after all to seek a new trial, he waives the procedure made available to him by G.S. 15A-979.