STATE OF NORTH CAROLINA v. CHARLIE TEW

No. 405A89

(Filed 13 June 1990)

**1. Appeal and Error § 75 (NCI4th)— DWI—motion to suppress breathalyzer reading denied—guilty plea—appealable**

Defendant could appeal the denial of his motion to suppress breathalyzer results despite a subsequent guilty plea

where he specifically reserved his right to appeal upon entering his plea. N.C.G.S. § 15A-979.

**Am Jur 2d, Appeal and Error § 271.**

2. **Automobiles and Other Vehicles § 126.2 (NCI3d) — breathalyzer test — results within .02 of each other — results rounded down**

The trial court did not err by admitting breathalyzer test results in a DWI prosecution where the inked test record pointer marked the instrument's test card at a point between .22 and .23 on the first test; the breathalyzer operator rounded this figure down to the nearest hundredth for a test result of .22; the pointer indicated an alcohol concentration of .20 on the second test; and the operator had therefore obtained two results within .02 of each other as required by N.C.G.S. § 20-139.1(b3). When read *in pari materia*, the term "readings" was intended by the Legislature to mean the test "results" recorded by the chemical analyst in hundredths, rounded down as provided in the Commission regulations.

**Am Jur 2d, Automobiles and Highway Traffic §§ 307, 375, 377, 380.**

Justice WEBB dissenting.

APPEAL by the State of North Carolina pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 95 N.C. App. 634, 383 S.E.2d 400 (1989), reversing the judgment of *Currin, J.,* at the 19 September 1988 Criminal Session of Superior Court, WAYNE County. Heard in the Supreme Court 12 March 1990.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, for the State-appellant.*

*Barnes, Braswell, Haithcock & Warren, P.A., by R. Gene Braswell and Glenn A. Barfield, for defendant-appellee.*

MEYER, Justice.

The issue presented in this case requires us to interpret certain provisions of N.C.G.S. § 20-139.1, the part of our Motor Vehicle Act governing the performing of chemical analysis of a driver's alcohol concentration and the admissibility into evidence of the results of such tests.

On 22 July 1987, defendant was arrested for driving while impaired (DWI). Defendant pled not guilty in district court and was adjudged guilty by Judge Joseph E. Setzer. Defendant appealed to the superior court for a trial *de novo*, entering a plea of not guilty. After impanelment of the jury, but prior to introduction of evidence, defendant orally moved to suppress the results of a chemical analysis performed at the time of his arrest. The court held a voir dire hearing on the motion, at which time Judge Samuel T. Currin denied defendant's motion to suppress. Defendant then entered a plea of guilty to DWI, specifically reserving his right to appeal the denial of his motion to suppress. Judge Currin found defendant guilty and sentenced him to level two punishment for the offense. Defendant appealed to the Court of Appeals. That court reversed the holding of the trial court and held that defendant's motion to suppress the test results should properly have been granted. Judge Cozort dissented from the majority vote. The State appeals to this Court as of right. This Court allowed the State's request for writ of supersedeas and stay on 25 September 1989. We now reverse the decision of the Court of Appeals.

[1] N.C.G.S. § 15A-979(b) provides that "[a]n order finally denying a motion to suppress evidence may be reviewed upon an appeal from a judgment of conviction, including a judgment entered upon a plea of guilty." Although not a part of the statute, the official commentary to that section provides some insight into the rationale and consequences of this provision:

> [Subsection (b)] permits a defendant whose motion to suppress was denied to plead guilty and then appeal the ruling of the judge on the motion. If the appellate court sustains the ruling on the motion, the conviction stands; if the ruling on the motion is overturned, then the defendant is entitled to a new trial at which the evidence would be suppressed. This provision is intended to prevent a defendant whose only real defense is the motion to suppress from going through a trial simply to preserve his right of appeal. This section on its face would apply whether the appeal is from district court or superior court, though the right of trial de novo already guarantees the defendant the right to renew motions in superior court — even after a plea of guilty. If the superior court judge reaffirms the ruling denying the motion to suppress, however, the Constitution of North Carolina may force the defendant either to plead guilty in superior court or go to trial . . . .

N.C.G.S. § 15A-979 official commentary (1988).

This Court has held that when a defendant intends to appeal from the denial of a suppression motion pursuant to this section, he must give notice of his intention to the prosecutor and to the court before plea negotiations are finalized; otherwise, he will waive the appeal of right provisions of the statute. *State v. Reynolds*, 298 N.C. 380, 259 S.E.2d 843 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 795 (1980). In the case *sub judice*, defendant did in fact specifically reserve his right to appeal upon entering his plea of guilty. Consequently, the path has been paved for us now to address the substantive issue presented.

[2] The State takes issue with the Court of Appeals' interpretation of the relevant statute, N.C.G.S. § 20-139.1 (1983). In relevant part, this statute provides as follows:

A chemical analysis, to be valid, must be performed in accordance with the provisions of this section. The chemical analysis must be performed according to methods approved by the Commission for Health Services by an individual possessing a current permit issued by the Department of Human Resources for that type of chemical analysis. The Commission for Health Services is authorized to adopt regulations approving satisfactory methods or techniques for performing chemical analyses

. . . .

N.C.G.S. § 20-139.1(b) (1983).

In conjunction with this provision, subsection (b3) provides in part:

By January 1, 1985, the regulations of the Commission for Health Services governing the administration of chemical analyses of the breath must require the testing of at least duplicate sequential breath samples. Those regulations must provide:

. . . .

(2) That the test results may only be used to prove a person's particular alcohol concentration if:

a. The pair of readings employed are from consecutively administered tests; and

> b. The readings do not differ from each other by an alcohol concentration greater than 0.02.

> (3) That when a pair of analyses meets the requirements of subdivision (2), only the lower of the two readings may be used by the State as proof of a person's alcohol concentration in any court or administrative proceeding.

N.C.G.S. § 20-139.1(b3) (1983).

In response to the Legislature's mandate, the Commission for Health Services developed appropriate operating procedures for use in conducting breathalyzer chemical analyses pursuant to the provisions set out in the statute. In regulation 10 NCAC 7B .0354, the Commission enunciated the following policy:

> (a) When performing chemical analyses of breath under the authority of G.S. 20-139.1 and the provisions of these rules, chemical analysts shall report alcohol concentrations on the basis of grams of alcohol per 210 liters of breath. All *results* shall be reported to hundredths. Any *result* between hundredths shall be reported to the next lower hundredth.

10 NCAC 7B .0354(a) (1987) (emphases added).

Defendant was arrested for DWI as a result of the observations of Officer A.W. Baldwin of the Goldsboro City Police Department. Officer Baldwin initially noted that defendant failed to dim his headlights in response to Baldwin's signal. As the patrol car pulled behind defendant's car, defendant weaved somewhat within his lane. After stopping defendant, Officer Baldwin spoke to him and noted that defendant had a strong odor of alcohol on his breath and acted in an abusive and boisterous manner.

Defendant was then taken before Trooper J.D. Booth, a twenty-year veteran of the North Carolina Highway Patrol and certified breathalyzer operator, who performed a chemical analysis of defendant's breath using the Breathalyzer Model 900. In accordance with the Commission's regulations as set forth on his operational checklist, Booth administered two tests of defendant's breath. The card used in the breathalyzer test bears no markings which would indicate readings in more precise increments than hundredths. The delineations on the face of the record card appear as

STATE v. TEW

[326 N.C. 732 (1990)]

and show no delineation more precise than hundredths.

In a typical breathalyzer test, the analyst positions the test record card in alignment with the face of the instrument, which is calibrated to two decimal places. A plastic cover encases the scale and the blood alcohol pointer. This cover is designed to allow the operator to apply pressure to the inked pointer in order to mark the test record card. Once the pointer has stopped at a particular point over the scale as a result of the introduction of the breath sample, the chemical analyst depresses the plastic cover, which in turn causes the inked pointer to make an ink impression on the card.

On the first test, Booth observed that the inked test record pointer marked the instrument's test record card at a point on the breathalyzer scale between .22 and .23. In accordance with the regulations, Booth rounded this figure downward to the nearest hundredth for a test result of .22. On the second test, the pointer indicated an alcohol concentration of .20. Because he rounded down the first reading, Booth obtained two results which were within .02 of each other as required by N.C.G.S. § 20-139.1(b3).

At the voir dire hearing on his motion to suppress the chemical analysis, defendant introduced into evidence the test record cards from which Booth observed and recorded the test results. Defendant contended that, although the card does not bear indications more precise than hundredths, by interpolation, the marking on the card for the first test indicated a "reading" of approximately .226 and the markings on the card for the second test indicated a "reading" of .20, and the test results thus were rendered invalid under subsection (b3) of the statute. That subsection specifically provides that "the test *results* may only be used to prove a person's particular alcohol concentration if . . . [t]he *readings* do not differ from each other by an alcohol concentration greater than 0.02." N.C.G.S. § 20-139.1(b3)(2) (1983) (emphases added).

Defendant argues that the word "results" used in the statute and the regulation and the word "readings" used in the statute are not synonymous and should be read as having different mean-

ings. He contends that "readings" refers to the actual ink markings which by interpolation may be read in various increments more precise than hundredths, whereas "results" can only refer to the readings after having been rounded down. We disagree.

Defendant alternatively contends that the meaning of the term "readings" is ambiguous because of possible confusion with the statute's use of the term "results." As such, defendant contends that the term should be strictly construed against the State and in favor of defendant because N.C.G.S. § 20-139.1 is a criminal statute. *State v. Martin*, 7 N.C. App. 532, 173 S.E.2d 47 (1970).

The majority of the panel of the Court of Appeals agreed with defendant's interpretation of the statutory provision. *State v. Tew*, 95 N.C. App. 634, 383 S.E.2d 400. Judge Cozort dissented, stating that while he did not disagree with the majority's literal interpretation of the statute, he believed that when the subsection is considered *in pari materia* with the remainder of the provisions governing procedures for chemical analysis, the intent of the Legislature was to interpret "readings" as the rounded-down results recorded by the chemical analyst. He did not believe that the General Assembly intended for the evidence obtained from breathalyzer readings to be suppressed when the rounded-down readings are within .02 of each other. We agree. Accordingly, we reverse the Court of Appeals.

This case requires us to interpret the legislative intent behind the enactment of N.C.G.S. § 20-139.1, a key provision of the Safe Roads Act of 1983. That Act was enacted in response to a growing public commitment to stronger enforcement of laws prohibiting drinking and driving. The Act was introduced on the first day of the 1983 legislative session as the first bill in each house. It became law only after reflecting the input from six standing committees which produced over one hundred amendments to the bill, and after a two-month review by a joint conference committee which was formed to resolve the differences between the competing versions submitted by each house.

It is a cardinal principle that in construing statutes, the courts should always give effect to the legislative intent. *State v. Fulcher*, 294 N.C. 503, 243 S.E.2d 338 (1978). In ascertaining such intent, a court may consider the purpose of the statute and the evils it was designed to remedy, the effect of proposed interpretations of the statute, and the traditionally accepted rules of statutory

construction. *Electric Service v. City of Rocky Mount*, 20 N.C.
App. 347, 201 S.E.2d 508, *aff'd*, 285 N.C. 135, 203 S.E.2d 838 (1974).

All parts of the same statute dealing with the same subject
are to be construed together as a whole, and every part thereof
must be given effect if this can be done by any fair and reasonable
interpretation. *Duke Power Co. v. Clayton, Comr. of Revenue*, 274
N.C. 505, 164 S.E.2d 289 (1968). A construction of a statute which
operates to defeat or impair its purpose must be avoided if that
can reasonably be done without violence to the legislative language.
*State v. Hart*, 287 N.C. 76, 213 S.E.2d 291 (1975). Individual expres-
sions must be construed as a part of the composite whole and
be accorded only that meaning which other modifying provisions
and the clear intent and purpose of the act will permit. *In re
Hardy*, 294 N.C. 90, 240 S.E.2d 367 (1978).

These rules apply to both criminal and civil statutes. *Vogel
v. Supply Co. and Supply Co. v. Developers, Inc.*, 277 N.C. 119,
177 S.E.2d 273 (1970). While a criminal statute must be strictly
construed against the State, the courts must nevertheless construe
it with regard to the evil which it is intended to suppress. *In
re Banks*, 295 N.C. 236, 244 S.E.2d 386 (1978).

In the context of the provision at issue here, it is undisputed
that the General Assembly intended to vest the Commission for
Health Services with sole responsibility for determining the methods
and procedures that would be employed in the sequential testing
of breath in the context of chemical analysis. In so doing, the
statute outlined the Legislature's expectations and goals, providing
in N.C.G.S. § 20-139.1(b3) that, by 1 January 1985, the Commission
regulations governing the administration of chemical analyses of
the breath shall require the testing of at least duplicate sequential
breath samples under the conditions set out by that statute. Follow-
ing the guidelines enumerated by the Legislature, the Commission
established the applicable procedures and published them in 10
NCAC 7B .0354. Quite clearly, the Commission mandated that the
chemical analyst, upon his examination of the markings placed upon
the test record card, record the test results in hundredths. Where
an issue of statutory interpretation arises, the construction adopted
by those who execute and administer the law in question is highly
relevant. *Comr. of Insurance v. Automobile Rate Office*, 294 N.C.
60, 241 S.E.2d 324 (1978); *MacPherson v. City of Asheville*, 283
N.C. 299, 196 S.E.2d 200 (1973). The construction adopted by the

Commission in this case is particularly instructive since the subject matter involves the proper use of a scientific instrument for which the Commission was authorized to determine the rules of operation.

Our appellate courts have previously held that the General Assembly's intent in enacting the provision requiring sequential blood testing was to ensure the accuracy of the process. *See State v. White*, 84 N.C. App. 111, 351 S.E.2d 828, *stay denied*, 319 N.C. 227, 353 S.E.2d 404, *dismissal allowed*, 319 N.C. 409, 354 S.E.2d 887 (1987). Our understanding of the testing procedure leads us to believe that the utilization of a trained chemical analyst's reading of the marks indicated on the test record card by the inked blood alcohol pointer would more often lead to accurate results than would reliance on a court's subsequent observation of the marked card. The breathalyzer scale is calibrated to hundredths. Because the point on the blood alcohol pointer may rest between two marks on the scale and because the ink often tends to bleed or smear due to the fact that the end of the pointer is blunt, the Commission requires the chemical analyst to give the benefit of the doubt to the defendant and record the results to the next lower hundredth rather than attempt to obtain a more precise result. Our analysis of similar statutes reveals that the General Assembly has consistently determined that results of a chemical analysis are to be reported only to two decimal places. *See, e.g.*, N.C.G.S. §§ 20-16.2, 20-16.5, 20-179 (1989).

We note that nowhere in the statute is there a requirement that the test record card be submitted as evidence. The fact that the Legislature did not require presentation of the card which bears the actual visual recordation of the breathalyzer marking indicates a legislative intent that the proffered "reading" be the analyst's rounded-down results upon his observation of the instrument as the regulations require. This recorded test result becomes memorialized in an affidavit, which itself is expressly admissible under the statute. N.C.G.S. § 20-139.1(e1) (1983). An interpretation requiring the courts to examine the test record cards in order to speculate as to whether the marking was accurately and precisely recorded by the analyst would defeat the Legislature's purpose of ensuring accurate results.

For the foregoing reasons, we conclude that when the General Assembly used the term "readings" in N.C.G.S. § 20-139.1(b3), it intended that the term be interpreted consistently with the regula-

STATE v. TEW

[326 N.C. 732 (1990)]

tions it required the Commission for Health Services to promulgate. When read *in pari materia* with the statute's remaining provisions, the term "readings" was intended by the Legislature to mean the test "results" recorded by the chemical analyst in hundredths, rounded down as provided in the Commission regulations. The trial court did not err in denying defendant's motion to suppress. We therefore reverse the holding of the Court of Appeals. This matter is remanded to the Court of Appeals for further remand to the Superior Court, Wayne County, for reinstatement of that court's judgment.

Reversed.

Justice WEBB dissenting.

I dissent. N.C.G.S. § 20-139.1(b3)(2) says:

(2) That the test results may only be used to prove a person's particular alcohol concentration if:

    a. The pair of readings employed are from consecutively administered tests; and

    b. The readings do not differ from each other by an alcohol concentration greater than 0.02.

In this case the readings differed from each other by an alcohol concentration greater than 0.02. The test results should not have been used. The elaborate reasoning of the majority is irrelevant. The plain meaning of the statute is clear and we should go no further in interpreting it. We may not like the result but it is not for us to change the statute.